[No. S058472. Jan. 29, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC WAYNE BENNETT, Defendant and Appellant.

## Counsel

Tamara P. Holland, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MORENO, J.**—A jury convicted defendant Eric Wayne Bennett of the first degree murder (Pen. Code, § 187, subd. (a))[1] of Marie Powell Evans and found two special circumstances to be true—that the murder was committed while engaged in the commission of rape (§ 190.2, former subd. (a)(17)(iii)) and burglary (*id.*, former subd. (a)(17)(vii)). The jury also convicted defendant of several crimes related to his assault of Pamela B., including forcible oral copulation (§ 288a, subd. (c)), rape (§ 261, subd. (a)(2)), first degree robbery within an inhabited dwelling (§§ 211, 212.5, subd. (a), 213, subd. (a)(1)), and first degree burglary of an inhabited dwelling (§§ 459, 460, subd. (a), 461, subd. 1). The jury found that defendant personally used a knife when he committed the crimes against Pamela B. (§ 12022, subd. (b).) The jury returned a death verdict. The trial court sentenced defendant to death on the murder count and imposed and stayed a determinate term of 15 years four months for the crimes against Pamela B. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).) We affirm the judgment.

[1] All further unlabeled statutory references are to the Penal Code.

## I. FACTUAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution's Case*

##### a. *Crimes Committed Against Pamela B.*

In mid-September 1994, defendant installed flooring at the Costa Mesa home of Mary Beth Baughman. Shortly thereafter, defendant signed a rental contract for an adjoining unit and he, his wife, and two children moved in. Pamela B. lived alone in a small apartment directly behind Baughman's unit with a driveway separating her unit from defendant's.

On September 27, about 10:00 p.m., Pamela B. was home alone watching television in her bedroom. As it was a warm evening, Pamela B. had her front door, which opened into her bedroom, open with the screen door closed and latched. Pamela B. saw defendant standing outside on her front porch.[2] She watched him bend over, take his shirt off and wrap it around his head and face "ninja style" so that only his eyes were uncovered. Defendant then charged through the door with a four-inch knife in his hand. Wearing only a pair of black shorts, defendant charged at Pamela B. and pinned her down on top of the bed. Holding the knife to Pamela B.'s neck, defendant told her that he would not hurt her and that he only wanted her money. Pamela B. screamed.

Baughman was inside her living room and heard the scream. She walked out onto her patio and yelled across the fence, "Pam, are you all right?" Baughman thought she heard a response, but could not understand what Pamela B. had said so she called out again. Defendant still had a knife to Pamela B.'s neck and said, "Shit. Tell her you're okay." Pamela B. did so and Baughman did not come any nearer.

Defendant again told Pamela B. that he wanted her money. Afraid defendant would harm her if she did not comply, she told him where her purse was. Defendant stayed within a foot of Pamela B. while she retrieved her purse and got her money out of it. After defendant took her money, he got upset and asked for the "rest of it." Pamela B. told him that was all she had and defendant rolled the money up and put it in his shorts. The shirt began to fall from defendant's face and, as he tightened it back up, defendant warned Pamela B. not to look at his face. "If you look at my face, I've got to hurt you."

---

[2] Although Pamela B. was unable to identify defendant as her attacker, DNA evidence obtained during a sexual assault examination was later matched to defendant's DNA. At the penalty phase, the defense acknowledged defendant had assaulted and raped Pamela B.

Defendant told Pamela B. he was not done and directed her to get facedown on the bed. Defendant got behind her, put his left arm under her abdomen and pulled her up on her hands and knees. Defendant rubbed her breasts and hips and rubbed his penis against her body. Defendant had a partial erection that he lost when he heard a car drive by. Defendant became angry and said, "Now, you got to suck it." Although terrified, Pamela B. refused. Defendant told her he would not hurt her, pushed her head onto his penis, and then insulted her about the manner in which she was orally copulating him. After defendant obtained an erection, he pulled Pamela B. to her hands and knees, got behind her, threw her nightgown over her head, and put his penis into her vagina.

After defendant ejaculated, Pamela B. ran out the front door. She ran outside her gate and turned left, near her car. Defendant gave chase and cornered Pamela B. by her car. He lunged at her, causing her to scream, at which point defendant ran away. Pamela B. lost sight of defendant.

Pamela B. ran to Baughman's unit and banged on her back door. After Baughman opened the door, Pamela B. entered and called 911. City of Costa Mesa Police Officer Mitchell Johnson responded within minutes. Officer Johnson did not see any cars leave the area and felt that the suspect must still be nearby. He quickly searched the area and set up a perimeter within a block of the location. When Officer Johnson met with Pamela B., she was "borderline hysterical" and crying. After calming her down, Officer Johnson was able to obtain a statement after which he took Pamela B. to the hospital for a sexual assault examination.

While Officer Johnson was obtaining a statement from Pamela B. at the apartment, Baughman was outside and saw defendant. Defendant asked what the police activity was about. Defendant said he had been sleeping on the sofa with his baby and the lights woke him up. Baughman told defendant she would rather not say. Defendant was insistent and, after he inquired several more times, Baughman told defendant Pamela B. had been raped. Defendant said that was terrible and left.

A sexual assault examination showed Pamela B. had suffered an abrasion near her vaginal opening and that there was sperm present in the secretions from her vagina. DNA was extracted from the semen.

After the rape, Pamela B. was in physical pain, could not move her right thumb for a week, and had a large bruise on the side of her thigh. She never slept at her apartment again and moved out at the end of October.

### b. *Evans's Murder*[3]

On September 27, 1994, the same day defendant assaulted Pamela B., he installed flooring at Marie Powell Evans's new townhouse in Laguna Hills.

On October 13, Evans went to the home of her daughter and son-in-law, Christine and John Hougan, to bring her son-in-law a birthday present. Evans had a dark leather purse with her. Evans left their home around 8:30 p.m. Around 11:00 a.m. the next morning, Christine received a phone call from Evans's boss, who told her that her mother had not shown up for work that morning, which was highly unusual. The Hougans worked for the City of Newport Beach Police Department, Christine as a police dispatcher and John as a police officer. Christine called someone from work and requested her mother's license plate be run to see if there had been a reported traffic accident. Upon discovering that there was no report of an accident involving Christine's mother, the Hougans went to Evans's house.

They entered Evans's patio area and saw that the window screen was off the kitchen window. John Hougan noticed that dust on the windowsill had been disturbed and a plant had been knocked over into the sink, leading him to think someone had crawled in through the window. Upon closer inspection, he observed a large amount of blood and a pillowcase on the kitchen floor. He took his wife back to the car and had her wait while he retrieved his gun and returned to the house. John entered the house through the front door, which was closed, but unlocked. There was a bloody bare footprint on the entryway throw rug that was facing downward toward the stairs. John then went downstairs and, when halfway down, saw Evans's seminaked body on the floor of the bathroom. After checking the other bedrooms to see if anyone was in the house, he phoned 911.

A rear sliding glass door leading into the master bedroom was found open with the screen door closed; the screen had a cut from top to bottom, leaving an opening large enough for a person to walk through. There was blood on the bed in the master bedroom and signs of a struggle, including a porcelain clock that had been knocked over. In the bathroom next to the master bedroom, Evans was lying on her back with her robe pulled up over her chest. There was blood on the bathroom door, floor, and wall. There was a bloody footprint next to the body and a wet towel, a television, and a pillow on top of Evans's head. The television's cord was plugged into a socket in the master bedroom and the television was still on.

There was a bloody footprint in the kitchen and another at the top of the stairs facing downwards, along with some potting soil. In the living room,

---

[3] Throughout the trial, Marie Powell Evans was referred to interchangeably as Powell and Evans. For the sake of uniformity, we use Evans when referring to the victim.

there were shelves holding several glass decanters. On one of the shelves, there was a ring-shaped impression in the dust as if something had been taken. On the kitchen counter there was a notepad with the name Eric (the same as defendant's first name) and a phone number, later determined to be defendant's, written on it. Missing from the house were Evans's purse and a glass decanter.

An autopsy showed Evans had suffered multiple major injuries. The autopsy determined she died as a result of bruising to her brain due to blunt force trauma. There were pattern marks on her face between the left eye and ear consistent with a blow from a heavy, patterned object. There were multiple skull fractures and tears in Evans's scalp. Her hands had skin breakage, lacerations, swelling and discoloration, which may have been from an attempt to ward off a blow. There were also marks in Evans's vaginal area that could have been injuries.

A sexual assault examination recovered sperm from Evans's anal, perianal, and perivaginal areas as well as her vagina. Sperm was also found on the bedsheets in the master bedroom. DNA was extracted from the sperm.

### c. *Defendant's Arrest*

Defendant did not return to his job after October 14. On October 18, aware that he had installed carpet in Evans's home, the police obtained defendant's fingerprints in an effort to exclude him as a suspect in the murder. Shortly afterwards, defendant and his wife moved out of his apartment without notifying his landlord that he would be moving.

For reasons not explained to the jury at the guilt phase, defendant was arrested on an unrelated charge by the San Diego County Sheriff's Department. While in custody, defendant's blood was drawn by a nurse and his DNA was compared to DNA recovered from the two crime scenes and found to match. The probability of a random match with semen and blood recovered from Pamela B. and her home was 1 in 1.2 billion within the general population. The probability of a random match with semen recovered from Evans's body was 1 in 17 million within the general population. The probability of a random match with semen recovered from Evans's bedsheets was one in seven million within the general population.

Defendant was arrested on October 31. The prosecutor presented the case to a grand jury, which returned an indictment on January 11, 1995.

### 2. *Defense Case*

At a live lineup two and a half months after the attack, Pamela B. was unable to pick defendant as the person who assaulted her. She instead picked

another man out of the lineup as the person most resembling her attacker. Nor could she make an in-court identification of defendant as the man who assaulted her. She described her attacker to the police as having a dark complexion, possibly black, with dark brown eyes, while defendant had blond-to-brown hair and blue eyes. Defendant presented evidence that none of the fingerprints that were taken at Evans's house matched his. Defendant also challenged the reliability of the DNA evidence and the probability estimates given by the prosecutor's DNA experts.

### B. Penalty Phase

#### 1. Prosecution's Case

The prosecution's case in aggravation consisted of two witnesses: Alice Ware, Evans's 82-year-old mother, and Christine Hougan. They described the impact Evans's death had on them. Additionally, Hougan testified about the impact it had on her to be present when her mother's body was found and Ware testified about finding out about Evans's murder over the phone from Hougan.

#### 2. Defendant's Case

The defense presented testimony about defendant's childhood. He was raised as a Jehovah's Witness, although he stopped attending church on a regular basis when he was a teenager and began using drugs. There was testimony of a family history of alcohol and drug abuse. Defendant himself had a significant problem with alcohol and drugs throughout his life. He was diagnosed in grade school as dyslexic. Defendant ultimately dropped out prior to completing high school.

Defendant's cousin testified that, when she was 11 or 12 years old and defendant was four or five years old, she was taking care of him and gave him a bath. She dried him off and then tried, unsuccessfully, to have sexual intercourse with him. After this incident, defendant engaged in other instances of inappropriate, precocious sexual behavior.

Defendant married Karen Bennett, his second marriage, in December 1991. They had a child together and she had a child from a previous relationship that defendant treated as his own. She testified that she still loved defendant and did not want to see him executed. She also testified that defendant was a good father to their two boys and she wanted him to continue his relationship with the children. Karen Bennett also testified that their marriage had been rocky at times due to, among other things, defendant's drug use. She testified that she demanded or asked defendant to commit to stopping his drug use.

Dr. Nancy Kaser-Boyd, a clinical psychologist, testified defendant had expressed guilt about his crimes and the effect his crimes had on his family and the families of the victims. She also testified that defendant exhibited risk factors for acting out sexually. Among the factors were his sexual molestation at the hands of his cousin; defendant's drug use; his dyslexia and attention deficit hyperactive disorder; and his dysfunctional family. Dr. Kaser-Boyd also testified extensively about the relationship between defendant and his stepson, opining that the child was attached to defendant and identified defendant as his father.

Defendant conceded that he had raped Pamela B. and killed Evans and presented evidence of his remorse. While he was in custody after his October 31 arrest, he returned to the Jehovah's Witnesses faith. Within weeks of his arrest, he confessed to his wife that he had killed Evans and raped Pamela B. and told her he wanted to plead guilty to spare those involved the pain of a trial. He cried and said he was sorry to her, their children, his parents, and the families of the victims. Defendant subsequently told his mother the same thing. He also expressed a desire to plead guilty to his attorneys but they, together with his family, sought to convince him to proceed to trial. Defendant's wife and her grandmother contacted James Waltz, an attorney and a Jehovah's Witness, and asked him to talk to defendant about whether to plead guilty. Defendant told Waltz that he wanted to plead guilty, but Waltz told defendant to cooperate with his attorneys. Rick Wentworth, an elder in the Jehovah's Witnesses church, testified that he had visited defendant in jail numerous times and that they had engaged in Bible study and talked about family. Jenks Janes, a Jehovah's Witness and recovering addict, testified he took defendant to an Alcoholics Anonymous meeting in August or September 1994. Janes testified that defendant sincerely desired to change his lifestyle and overcome his addiction to drugs.

## II. Discussion

### A. Pretrial and Guilt Phase Issues

#### 1. Failure to Record Portions of Grand Jury Proceedings

The district attorney sought an indictment from the grand jury. Defendant contends critical portions of the grand jury proceedings were not recorded, thereby violating state law and the Eighth and Fourteenth Amendments to the United States Constitution. Specifically, defendant argues reversal is required because of the failure to record the superior court's interview of prospective grand jurors and an alleged meeting between the prosecutor and the grand jury. We disagree.

At the time of defendant's trial, section 190.9 required that, "[i]n any case in which a death sentence may be imposed, all proceedings conducted in

the . . . superior courts . . . shall be conducted on the record with a court reporter present." (Stats. 1993, ch. 1016, § 3, p. 5739.) Defendant cites *Dustin v. Superior Court* (2002) 99 Cal.App.4th 1311, 1321–1323 [122 Cal.Rptr.2d 176] for the proposition that section 190.9 applies as well to grand jury proceedings in capital cases.

While the federal Constitution does not require that all proceedings be transcribed, it does require that there be a record adequate to permit meaningful appellate review. (*People v. Howard* (1992) 1 Cal.4th 1132, 1165–1166 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) A record is inadequate "only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365].) It is defendant's burden to show that any deficiencies are prejudicial. (*People v. Young* (2005) 34 Cal.4th 1149, 1170 [24 Cal.Rptr.3d 112, 105 P.3d 487].) Inconsequential inaccuracies or omissions are insufficient to constitute prejudice. Nor will mere speculation suffice. (*Ibid.*)

### a. *Interviews of Prospective Grand Jurors*

On May 18, 1994, the Orange County Superior Court selected 19 individuals from a roster of 29 nominees to comprise the 1994–1995 grand jury (§ 895). Section 896 requires that the superior court personally interview each prospective grand juror to ascertain whether they possess the qualifications required by section 893.[4] As part of the appellate record completion process, defendant sought to augment the record with transcripts of the superior court's interview and selection of the grand jury. Neither the interviews nor the selection process was recorded.[5] Defendant argues this constitutes reversible error. We disagree.

Section 190.9 requires that all proceedings be reported in a "case in which a death sentence may be imposed." The Court of Appeal concluded in *Dustin* that section 190.9 applies to grand jury proceedings in death penalty cases where indictments are returned. (*Dustin v. Superior Court, supra*, 99 Cal.App.4th at p. 1322.) That case is unlike this one. There, the Court of Appeal considered a defendant's pretrial claim that the prosecutor violated section 190.9 by ordering the court reporter to leave while he gave his opening and closing statements to the grand jury. (99 Cal.App.4th at

---

[4] Among other things, section 893 requires that grand jurors be United States citizens, 18 years or older, a resident of the county for at least one year before being selected, and "in possession of [their] natural faculties, of ordinary intelligence, of sound judgment, and of fair character." (§ 893, subd. (a).)

[5] Section 896 does not require that the superior court's interview of potential grand jurors be recorded or transcribed.

pp. 1314–1315.) Even assuming *Dustin* was correctly decided, section 190.9 cannot reasonably be interpreted to apply before a "case" even exists. Defendant did not commit his crimes until September 1994, he was not arrested until October 1994, and the case was not presented to the grand jury until January 1995. The "case" could not have been said to exist in May 1994 when the 1994–1995 grand jury was interviewed, selected, and empaneled. Section 190.9 does not impose a duty to record the personal interviews of prospective grand jurors. Nor is there a constitutional violation, as defendant has failed to establish that the absence of the sought record prejudices his ability to prosecute his appeal. (*People v. Alvarez, supra,* 14 Cal.4th at p. 196, fn. 8.)

### b. *Alleged Meeting Between Prosecutor and Grand Jury*

On Thursday, January 5, 1995, Deputy District Attorney Carolyn Kirkwood presented the state's case to the grand jury. The next morning, Friday, January 6, Kirkwood gave her closing argument and answered the grand jury's questions. The foreperson then excused Kirkwood and the court reporter so the jury could begin deliberating. Later that afternoon, Kirkwood and District Attorney Guy Ormes returned to address several written questions the jury had submitted. Afterwards, the grand jury resumed deliberations, but recessed for the day without returning an indictment.

On Wednesday, January 11, Ormes and Kirkwood returned to address more questions submitted by the grand jury. Ormes noted the jury had recessed Friday without returning an indictment and said, "Since that time you presented me with a—actually several questions . . . ." Ormes indicated the People were prepared to address the questions by calling additional witnesses. Ormes and Kirkwood first addressed several questions themselves. When addressing one of the questions, Kirkwood remarked, "We received a note from the grand jury on [Monday,] January 9, 1995 . . . ." The People then examined several witnesses, after which Kirkwood made concluding remarks and the jury resumed its deliberations. Later that afternoon, it returned an indictment against defendant.

Defendant moved to dismiss the indictment. He argued that the grand jury indicted him only after the prosecution presented additional, allegedly inadmissible, evidence on January 11. At a hearing on the motion, counsel for both sides discussed whether the jury "refused" to return an indictment on January 6, whether it deliberated on January 9 and 10, and how it transmitted its questions to the prosecution. Defendant asked to examine Ormes and the foreperson about whether the jury deliberated on January 9 and 10, whether it had taken a vote prior to January 11, and whether there were any unreported

discussions between it and the prosecutors. The court denied the request, but ordered the prosecutor to produce the jury's written questions for in camera review.

The court reviewed the written notes in chambers with only the prosecutors present. One note, written by the foreperson, was dated January 9 and contained questions about the People's DNA evidence, whether there was any non-DNA evidence implicating defendant, and about exculpatory evidence. Another note, also written by the foreperson, was dated January 10 and began, "These 4 points are what I told the panel I had discussed with you." The note then listed points regarding the DNA evidence, the existence of corroborative evidence, and exculpatory evidence. The note concluded by informing the prosecutor that the grand jury would be convening at 8:45 a.m. on January 11.

As part of the appellate record completion process, defendant sought to augment the record with an explanation of the procedure followed for transmitting the grand jury's questions to the district attorney, any record of when grand jury proceedings took place, and transcripts of any communications between the grand jury and any prosecutor other than remarks contained in existing transcripts. At a hearing, the superior court appellate clerk explained that there were no other transcripts to produce. She indicated that the district attorney had told her the jury had been deliberating on January 9 and 10, so there was no transcript for those days. The jury wrote questions down on those days, transmitted the questions to the district attorney, and the questions were answered on January 11. The People indicated there was no set procedure for communicating questions from the grand jury to the district attorney and it could therefore not say how it was done in this case.

Defendant contends the record suggests the prosecutor had a number of unreported communications with the grand jury in violation of section 190.9 and *Dustin v. Superior Court*. He first relies on the January 9 and January 10 written questions, which he claims suggest unreported communications took place because the grand jury had to give the written questions to the prosecutor. He also places great weight on the prosecutor's readiness to answer the questions on January 11 with live testimony, arguing this demonstrates the existence of unreported communications. We conclude that neither establishes an unreported communication took place. It is just as likely that the grand jury transmitted its notes to the district attorney in an innocuous manner without direct communication, putting the district attorney on notice that it needed to present more evidence to answer the jury's questions. Moreover, even assuming unreported communications took place, defendant has failed to identify anything other than mere speculation to support his contention that he has suffered prejudice, i.e., that the grand jury's decision to

indict may have been in some way influenced by the alleged unreported communications. (*People v. Young, supra*, 34 Cal.4th at p. 1170.) A defendant seeking postconviction reversal for irregularities in grand jury proceedings must establish that the complained-of errors were structural or resulted in actual prejudice relating to his conviction. (*People v. Jablonski* (2006) 37 Cal.4th 774, 800 [38 Cal.Rptr.3d 98, 126 P.3d 938].) Defendant does not establish the existence of an irregularity justifying postconviction reversal.

Defendant also points to the opening sentence of the January 10 note. In it, the foreperson wrote "These 4 points are what I told the panel I had discussed with you." This statement does indicate the foreperson had an unreported conversation with the district attorney. However, even assuming this constitutes error, defendant fails to establish the necessary prejudice to warrant postconviction reversal. (*People v. Jablonski, supra*, 37 Cal.4th at p. 800; *People v. Alvarez, supra*, 14 Cal.4th at p. 196, fn. 8.) The statement indicates that the topic of conversation was memorialized in the note. Moreover, the contents of the January 10 note are nearly identical to the substance of the January 9 note, suggesting that the four topics identified in the two notes constitute the extent of the jury's interest.[6]

### 2. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct during the guilt phase of the trial when, in the course of examining a prosecution witness, she implied defendant could, and should, have had the DNA evidence retested. Defendant argues reversal is required because his rights under state law and the Fifth, Sixth, and Fourteenth Amendments to the federal Constitution were violated. We disagree.

Mary Hong, a crime lab forensic scientist called by the prosecution, testified extensively about DNA, the DNA testing in the case, and on the methods and reliability of DNA testing. On cross-examination, defense counsel elicited that the crime lab, which did the DNA testing, was affiliated with the Orange County Sheriff's Department. Defense counsel also elicited that the crime lab performed analyses for other police agencies, but that it was not open to the public nor could a private person come in and ask for assistance in doing an analysis.

On redirect examination, the prosecutor explicitly referenced defense counsel's question about private persons not being able to obtain the crime lab's

---

[6] Citing *Dustin v. Superior Court, supra*, 99 Cal.App.4th 1311, defendant argues we should apply a reversal per se standard. We disagree. Unlike this case, *Dustin* involved a *pretrial* challenge where the Court of Appeal ordered the superior court to dismiss the indictment. As the court noted in *Dustin*, in a *postconviction* case a defendant must show actual prejudice. (*Id.* at p. 1325.) Defendant fails to do so.

assistance in analyzing DNA. The prosecutor then asked, "Are you familiar with a procedure where the defense can come in and actually get a split of the sample of evidence and have it tested privately in any lab that they choose?" Hong answered, "Yes," and the prosecutor followed up by asking whether "any split [was] asked for in this particular case so that the defense could have retested any particular sample or any particular test . . . ." Defense counsel objected and asked to approach.

The trial court excused the jury for the day and then heard counsel's argument. Defense counsel argued that the question was irrelevant and was substantially more prejudicial than probative as the jury would infer that defendant's failure to retest meant he agreed with the results of the People's DNA testing. The prosecutor responded that the question was relevant to demonstrate that the evidence was available for retesting if defendant so desired. The trial court said, "That's in." The prosecutor then pointed out defense counsel had opened the door by eliciting testimony about the inability of a private person to seek assistance with analysis. The court said there was a difference between the ability of a private person to request a split of a sample of evidence and whether such a split was sought by defendant in this case. The latter area of inquiry would lead to questions about the credibility and competence of defense counsel and why they did not seek a split for retesting. Accordingly, the trial court ruled the probative value was substantially outweighed by the risk of prejudice and sustained the objection to the question of whether defendant sought a split.

The next morning, defense counsel moved for a mistrial on the basis of prosecutorial misconduct. Defense counsel argued that the prosecutor's question had implied to the jury that it was defendant's burden to provide evidence. Failing a mistrial, defense counsel requested an admonition. The trial court denied defendant's motion for a mistrial, explaining that the brief question did not cause such prejudice that it could not be sufficiently cured with an admonition. Further, the trial court declined to conclude the prosecutor had committed misconduct. The trial court indicated it would admonish the jury, and upon resumption of redirect examination, did in fact admonish the jury that the court had sustained defendant's objection, that questions are not evidence, and that the jury should not speculate as to what the answer might have been.

Later, during the redirect examination of Ed Buse, another crime lab forensic scientist, the prosecutor asked, "And there are samples available in the crime lab on this case, so that if there were more probes—." Defense counsel objected and asked to approach. Defense counsel argued the prosecutor's question again insinuated that defendant had the burden to retest the DNA sample. The prosecutor responded that she, consistent with the court's

earlier ruling, was not asking whether the defense sought a sample, but rather whether there was evidence available for retesting at all. The trial court nonetheless sustained the objection, ruling that the question improperly implied defendant should have retested the available sample. The prosecutor could ask whether there was a sample available for the *crime lab* to test, but could not imply defendant could use it to retest if he wanted to.

During the cross-examination of Dr. Bruce Kovacs, the prosecution expert called to testify about the reliability of DNA evidence, defense counsel challenged the testing protocol followed in this case. The defense also asked Dr. Kovacs whether one of the DNA tests had gone wrong because the printout did not show a control blank. Dr. Kovacs responded that, in the specific sample counsel cited, it could not be determined whether something had gone wrong. In her redirect examination the prosecutor asked, "Would there be a way—if somebody wanted to—to see if there was a problem, that they could go back and run a control blank on this?" Defense counsel objected that the question was irrelevant and speculative, and the trial court sustained the objection as speculative. The prosecutor then asked, "Doctor, are you familiar with ways in which a sample can be tested months or years later to determine if there was any problem that existed at the time?," to which Dr. Kovacs responded, "Yes." Dr. Kovacs explained how DNA evidence was frozen and kept, allowing retesting. Defendant did not object.

During the cross-examination of defense DNA expert witness, Dr. William Shields, the prosecutor asked whether he, had he been asked to, could have taken evidence, such as the evidence in this case, and run an analysis. Dr. Shields testified that he could do that. The prosecutor then asked whether a National Research Counsel report recommended retesting to ensure quality control, and Dr. Shields agreed that retesting was recommended. The prosecutor continued, "In other words, retesting is a wrongly accused person's best insurance against the possibilities of being falsely—." Defense counsel objected and the trial court sustained the objection.

During closing arguments, the court granted defense counsel's request for an order prohibiting the prosecutor from commenting on defendant's failure to retest the DNA evidence.

Defendant claims the prosecutor's questions constituted reversible misconduct because they allegedly insinuated defendant should have retested the DNA evidence. We disagree.

■ A prosecutor's conduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due

process.' [Citation.]" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464].) The focus of the inquiry is on the effect of the prosecutor's conduct on the defendant, not on the intent or bad faith of the prosecutor. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citation.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

To preserve a claim of prosecutorial misconduct for appeal, " 'the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15].) When a trial court sustains defense objections and admonishes the jury to disregard the comments, we assume the jury followed the admonition and that prejudice was therefore avoided. (*People v. Jones* (1997) 15 Cal.4th 119, 168 [61 Cal.Rptr.2d 386, 931 P.2d 960].) Whether misconduct warrants a mistrial is a decision which is within the sound discretion of the trial court. (*People v. Price* (1991) 1 Cal.4th 324, 430 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

■ Defendant first argues the prosecutor violated the work product privilege by asking questions that sought to invade defense counsel's impressions or thought process. We initially note that the claim is forfeited because defendant failed to invoke the work product privilege as the basis of his objection or to request an admonition when an admonition would have cured any prejudice. (*People v. Earp, supra*, 20 Cal.4th at p. 858.) Furthermore, we conclude the prosecutor's questions did not violate the work product privilege. In rejecting a nearly identical claim, we recently explained that section 1054.6 provides that the privilege applies in criminal cases only to materials or information that are work product as defined in Code of Civil Procedure section 2018.030, subdivision (a).[7] (*People v. Zamudio* (2008) 43 Cal.4th 327, 351–356 [75 Cal.Rptr.3d 289, 181 P.3d 105].) That subdivision defines work product as a "*writing* that reflects an attorney's impressions, conclusions, opinions, or legal research or theories." (Code Civ. Proc., § 2018.030, subd. (a), italics added.) The prosecutor's questions at issue here merely sought to clarify that, contrary to defense counsel's implication, DNA samples were available for independent testing. As such, the prosecutor's questions did not elicit or attempt to elicit evidence of a "writing" reflecting defense counsel's "impressions, conclusions, opinions, or legal research or theories" and therefore did not violate the work product privilege.

---

[7] The voters enacted section 1054.6 in 1990 by passing Proposition 115. Defendant's crimes and trial occurred well after 1990.

Defendant also argues the prosecutor committed misconduct by blatantly ignoring the trial court's rulings. To the contrary, the record established that the prosecutor was trying to follow what was, at times, less than clear guidance from the court. The prosecutor first asked Hong whether the defense had requested a split for retesting. The court sustained defendant's objection, but told the prosecutor she *could* ask whether evidence was available for retesting. During her examination of Buse, the prosecutor asked whether samples were available for further testing. Even though the question was consistent with the court's prior ruling, the court sustained defendant's objection and suggested the prosecutor only ask whether evidence was available for the *crime lab* to retest. After defense counsel elicited testimony from Dr. Kovacs about a problem with one of the DNA tests, the prosecutor asked whether it would be possible to retest a sample to determine whether there had been any problems. Nothing about the question suggested the prosecutor was talking about retesting by defendant, as opposed to the crime lab. Finally, when examining Dr. Shields, following up on the witness's testimony that a report recommended retesting to ensure quality control, the prosecutor asked whether, therefore, retesting was a wrongly accused person's best insurance against being falsely convicted. An objection was sustained and the prosecutor moved on. While the last question could be interpreted as having violated the court's rulings, the record demonstrates that, overall, the prosecutor was attempting to follow the court's instructions regarding what was permissible.

■ Defendant makes a number of other arguments that we briefly address. Defendant claims the prosecutor's questions violated *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], in which the high court held the prosecution may not comment on a defendant's failure to testify. (*Id.* at p. 615.) However, *Griffin* does not prevent a prosecutor from commenting upon the evidence or upon the failure of the defense to introduce material evidence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Nor did the prosecutor's questions, as defendant asserts, violate his attorney-client privilege. ■ The privilege protects the disclosure of "a confidential communication between client and lawyer." (Evid. Code, § 954.) Asking whether there was evidence available for retesting, and even whether the defense sought a split of the sample, did not violate the privilege. (*People v. Coddington* (2000) 23 Cal.4th 529, 605 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) Nor did the prosecutor's questions shift the burden of proof onto defendant. The prosecutor did not state or imply that defendant had a duty to produce evidence. The complained-of questions merely asked whether there was evidence for retesting. Moreover, the jury was instructed that the prosecution bears the burden of proof. We presume the jury followed the instructions it was given. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

We conclude the prosecutor's questions did not constitute reversible misconduct.

### 3. *Jury Instructions Regarding Felony Murder*

Defendant claims the trial court violated state law and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it failed to properly instruct the jury on first degree felony murder. Specifically, defendant contends the court failed to instruct the jury that, to find him guilty of first degree felony murder, it must find a concurrence of act and intent. Defendant also argues the instructions failed to properly limit the first degree felony-murder doctrine. We disagree.

The prosecutor's theory was that defendant was guilty of first degree murder both because he had committed premeditated and deliberate murder and because he had murdered Evans during the course of the felony of rape or burglary. The prosecutor's theory for the burglary was that defendant entered Evans's condominium with the intent to steal from her and/or rape her.

After the closing arguments, the jury was instructed pursuant to CALJIC No. 8.21 that "[t]he unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of rape or burglary is murder of the first degree when the perpetrator had the specific intent to commit such crime. The specific intent to commit rape or burglary and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." The jury was also instructed pursuant to CALJIC No. 3.30 that, for the crimes of forced oral copulation and rape, "there must exist a union or joint operation of act or conduct and general criminal intent." The jury was instructed pursuant to CALJIC No. 3.31, that, for the "crimes of burglary and robbery and the special circumstance allegations of murder during the commission of burglary and murder during the commission or attempted commission of rape, there must be a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator."

Defendant contends these instructions failed to convey that, in order to find him guilty of first degree murder, the jury needed to find a concurrence of act and intent—namely, that defendant formed the intent to commit rape or burglary before or during, rather than after, the application of force to the victim. We disagree. We have previously rejected an identical attack on similar instructions. In *People v. Pollock* (2004) 32 Cal.4th 1153 [13 Cal.Rptr.3d 34, 89 P.3d 353], the defendant was charged with first degree felony murder and, like defendant here, claimed the trial court had erroneously failed to instruct the jury "on the concurrence of act and specific intent

required for first degree felony murder . . . ." (*Id.* at p. 1175.) The *Pollock* trial court gave the jury the same standard instructions given here, namely CALJIC Nos. 3.31 and 8.21. (32 Cal.4th at pp. 1175–1176.) We concluded that the instructions given were sufficient. (*Id.* at p. 1176.) "More specific instructions on this issue are considered pinpoint instructions that the trial court is required to give only upon request [citation] . . . ." (*Ibid.*) As in *Pollock*, defendant did not request more specific instructions, nor did he object to the instructions given by the court.

Moreover, even assuming the trial court erred, any error was harmless beyond a reasonable doubt as any defect clearly did not affect the verdict. (*People v. Harris* (2008) 43 Cal.4th 1269, 1300 [78 Cal.Rptr.3d 295, 185 P.3d 727].) In addition to finding defendant guilty of first degree felony murder, the jury returned a true finding on the charged special circumstances. In order to find true the special circumstance allegations of murder during the commission of burglary and murder during the commission or attempted commission of rape, which it ultimately did, the jury was instructed it had to find there was "a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator."

Defendant also argues the instructions did not convey that the felony cannot be "incidental" to the murder. However, we concluded in *Pollock* that the standard instructions adequately inform the jury "that the defendant must apply the force *for the purpose* of accomplishing the taking." (*People v. Pollock, supra,* 32 Cal.4th at p. 1176, italics added.) Defendant contends the instructions failed to inform the jury that the murder and the felony must be part of a "continuous transaction." To the contrary, the instructions properly informed the jury that, to find defendant guilty of first degree murder, it had to find the killing "occur[red] *during* the commission or attempted commission of rape or burglary . . . ." (Italics added.) Finally, defendant argues the instructions did not adequately convey that the intent to steal must have been formed before or during the application of force to the victim. We rejected this very argument in *Pollock.* (*Ibid.*)

We accordingly conclude the trial court adequately instructed the jury on first degree felony murder.

### 4. *Cumulative Error*

Defendant contends the cumulative effect of the various errors committed during the guilt phase requires reversal of his conviction. As we have rejected the individual claims of error, we conclude there is no cumulative error requiring reversal.

### B. *Penalty Phase Issues*

#### 1. *Request to Empanel a Separate Jury*

Defendant claims the trial court violated state law and his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it denied his motion to empanel a separate jury for the penalty phase. We conclude the trial court did not err.

Defendant's guilt phase strategy was to argue the state had failed to meet its burden of proving beyond a reasonable doubt that he had committed the charged crimes. After defendant was convicted, his counsel moved to empanel a new jury for the penalty phase, arguing that his penalty phase defense would be inconsistent with what was argued at the guilt phase. At the penalty phase, defendant intended to establish that he had admitted his guilt to his family and counsel early on in the proceedings, that he felt remorse, and that he had wanted to plead guilty, but was talked out of it by his attorneys. Defense counsel argued that, in light of the strategy employed during the guilt phase, the currently empaneled jury would disbelieve defendant and his attorneys.

The trial court denied defendant's motion, noting that his guilt and penalty phase strategies were not inconsistent, different defense attorneys would be handling the guilt and penalty phases, the court would admonish the jury that defendant's exercise of his right to a trial was not to be considered during deliberations,[8] and that, even if the two strategies were arguably in tension with one another, tactical decisions do not constitute good cause to empanel a separate jury. The trial court concluded that a new jury was not warranted under state law or under the federal Constitution.

■ Section 190.4, subdivision (c) provides that the same jury that decided guilt in a death penalty case "shall consider . . . the penalty to be applied, unless *for good cause* shown the court discharges that jury . . . ." (Italics added.) While a trial court retains discretion to empanel a separate jury, there is a " ' "long-standing legislative preference for a single jury to determine both guilt and penalty." ' [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 114 [109 Cal.Rptr.2d 31, 26 P.3d 357]; see *People v. Yeoman* (2003) 31 Cal.4th 93, 119 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Kraft* (2000) 23 Cal.4th 978, 1069 [99 Cal.Rptr.2d 1, 5 P.3d 68].) We review a trial court's ruling on a motion to empanel a separate penalty phase jury for abuse of discretion. (*People v. Kraft, supra*, 23 Cal.4th at p. 1069.)

---

[8] The trial court ultimately instructed the jury that it was not to "draw any adverse inferences against the defendant for exercising his constitutional right to a trial by jury." We presume the jury followed the instructions it was given. (*People v. Prince, supra*, 40 Cal.4th at p. 1295.)

Defendant contends that his desire to employ allegedly "conflicting" strategies constituted good cause to empanel a separate penalty phase jury. We disagree. Even assuming defendant's guilt and penalty phase strategies were in tension with one another, a counsel's tactical decision to present inconsistent defenses "do[es] not, without more, constitute good cause." (*People v. Catlin, supra*, 26 Cal.4th at p. 115; see *People v. Pride* (1992) 3 Cal.4th 195, 252 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Taylor* (1990) 52 Cal.3d 719, 737–738 [276 Cal.Rptr. 391, 801 P.2d 1142].) Additionally, defendant's assertion that his and his counsel's credibility would be undermined was too speculative to establish sufficient good cause. (*People v. Pride, supra*, 3 Cal.4th at p. 253; *People v. Taylor, supra*, 52 Cal.3d at p. 738.)

Nor were defendant's constitutional rights violated by having the same jury decide the guilt and penalty phases. The high court has repeatedly rejected such claims, explaining that the federal Constitution permits "the same jury [to] sit in both phases of a bifurcated capital murder trial." (*Lockhart v. McCree* (1986) 476 U.S. 162, 180 [90 L.Ed.2d 137, 106 S.Ct. 1758]; see *Buchanan v. Kentucky* (1987) 483 U.S. 402, 417 [97 L.Ed.2d 336, 107 S.Ct. 2906].) This court has reached the same conclusion. (*People v. Catlin, supra*, 26 Cal.4th at p. 115; *People v. Johnson* (1992) 3 Cal.4th 1183, 1244 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 [222 Cal.Rptr. 184, 711 P.2d 480].) Nothing warrants revisiting the issue.

We therefore conclude the trial court did not err when it denied defendant's motion for a separate jury.

### 2. *Exclusion of Defendant's Execution-impact Evidence*

Defendant contends the trial court violated state law and his constitutional rights when it excluded an expert's testimony about the impact defendant's execution would have on his son and stepson. Defendant argues that the testimony should have been permitted as mitigation evidence indirectly relevant to his character. We disagree.

During the penalty phase, the defense indicated its intent to have Dr. Kaser-Boyd testify about the effect defendant's execution would have on his children. The prosecutor indicated she would object to such testimony because it would be speculative and would constitute irrelevant execution-impact evidence. After some discussion between counsel and the court, defense counsel asked the court to defer ruling so that he could talk with Dr. Kaser-Boyd to get a better sense of the possible testimony.

The next morning, defense counsel told the court Dr. Kaser-Boyd would testify that, when a child loses a parent for any reason, "there is a feeling of

abandonment and grief . . . that often can interfere with normal development" and result in feelings of anxiety or distrust, whereas those feelings would be less if the defendant were sentenced to life without parole. The prosecutor objected to the proposed testimony because it would constitute impermissible execution-impact evidence and would be speculative. The prosecutor also argued that the effect that losing one's parent would have on a child was not a proper subject for expert testimony because the jury was capable of considering the impact on its own. The trial court sustained the prosecutor's objection and excluded the evidence, but it made clear that the defense would still be able to solicit testimony from Dr. Kaser-Boyd regarding defendant's character, nature, and potential for future contribution.[9]

 We conclude the trial court did not err. The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation. (*People v. Smith* (2005) 35 Cal.4th 334, 366–367 [25 Cal.Rptr.3d 554, 107 P.3d 229]; *People v. Smithey* (1999) 20 Cal.4th 936, 1000 [86 Cal.Rptr.2d 243, 978 P.2d 1171]; *People v. Ochoa* (1998) 19 Cal.4th 353, 454-456 [79 Cal.Rptr.2d 408, 966 P.2d 442] (*Ochoa*).) In *Ochoa*, we explained it is a defendant's background and character, and "not the distress of his or her family," that is relevant under section 190.3. (19 Cal.4th at p. 456.) We distinguished between "evidence that [a defendant] is loved by family members or others, and that these individuals want him or her to live . . . [and evidence about] whether the defendant's family deserves to suffer the pain of having a family member executed." (*Ibid.*) The former constitutes permissible indirect evidence of a defendant's character while the latter improperly asks the jury to spare the defendant's life because it "believes that the impact of the execution would be devastating to other members of the defendant's family." (*Ibid.*)

In arguing that the trial court erred when it excluded part of Dr. Kaser-Boyd's testimony, defendant contends it constituted permissible evidence of defendant's character. We disagree. As defense counsel told the trial court, Dr. Kaser-Boyd intended to testify that defendant's execution would have a "damaging effect" on his children and the children would have "a feeling of abandonment and loss" requiring therapy and intervention. Such testimony, rather than "illuminat[ing] some positive quality of the defendant's background or character" (*Ochoa, supra,* 19 Cal.4th at p. 456), was impermissible execution-impact evidence intended to make the jury feel "sympathy for . . . defendant's family."[10] (19 Cal.4th at p. 456.)

---

[9] Indeed, Dr. Kaser-Boyd testified at length about defendant's relationship with his children, the children's feelings for defendant, and how defendant's relationship with his children would likely continue should he live.

[10] By contrast, the trial court permitted the expert to testify about the children's bond with defendant, their love for him, and how they would benefit from a continuing relationship if he

Defendant alternatively argues that, even if the testimony constituted execution-impact evidence, the trial court should have nonetheless allowed it. Defendant acknowledges we rejected an identical claim in *Ochoa*, but he argues our decision was wrongly decided for several reasons. None is persuasive.

Defendant first asserts that *Ochoa* conflicts with the high court's decision in *Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597]. There, the high court held that *victim-impact* evidence is admissible during the penalty phase. (*Id.* at pp. 811, 829.) Defendant argues the high court's decision contains an implicit recognition capital defendants have the right to introduce *execution-impact* evidence. To the contrary, the high court made clear, consistent with *Ochoa*, that a defendant must be allowed to introduce mitigating evidence "concerning *his own circumstances.*" (*Payne, supra,* 501 U.S. at p. 822, italics added.) As we have explained, execution-impact evidence is irrelevant under section 190.3 because it does not concern a defendant's *own circumstances* but rather asks the jury to spare defendant's life based on the effect his or her execution would have on his or her family. (*Ochoa, supra,* 19 Cal.4th at p. 456.) We further concluded that nothing in the federal Constitution requires a different result (*Ochoa,* at p. 456) and defendant identifies no reason to reconsider our conclusion.

Defendant next argues section 190.3, which permits the prosecutor and defendant to introduce evidence "as to any matter relevant to aggravation, mitigation, and sentence," should be construed to permit execution-impact testimony as evidence relevant to mitigation and sentence. We rejected this construction in *Ochoa, supra,* 19 Cal.4th at page 456, and we see no reason to revisit the issue. Defendant's argument rests on the use of the word "mitigation" in statutes governing determinate sentencing (§ 1170) and probation (§ 1203). Neither statute is analogous to section 190.3. Unlike those statutes, section 190.3 identifies examples of matters relevant to aggravation, mitigation, and sentence including, but not limited to, the "circumstances of the present offense, any prior felony conviction . . . , and the defendant's character, background, history, mental condition and physical condition." We concluded that, "[i]n *this context*, what is ultimately relevant is a defendant's background and character—not the distress of his or her family." (*Ochoa, supra,* 19 Cal.4th at p. 456, italics added.) The statutes cited by defendant have no bearing upon this court's construction of section 190.3.

---

were allowed to live. Such testimony "constitute[d] indirect evidence of the defendant's character." (*Ochoa, supra,* 19 Cal.4th at p. 456.)

We conclude the trial court did not err when it excluded the portion of Dr. Kaser-Boyd's testimony concerning the effect defendant's execution would have on his children.[11]

### 3. *Other Penalty Phase Evidentiary Rulings*

Defendant contends the trial court made four erroneous evidentiary rulings that allowed the prosecutor to wrongly impeach defendant's mitigation witnesses. Defendant claims these rulings violated state law and the federal Constitution requiring reversal of the penalty verdict.[12] We disagree.

While a capital defendant must be permitted to offer any relevant mitigating evidence (§ 190.3; *People v. Marlow* (2004) 34 Cal.4th 131, 152 [17 Cal.Rptr.3d 825, 96 P.3d 126]; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4–8 [90 L.Ed.2d 1, 106 S.Ct. 1669]), this does not " 'abrogate[] the California Evidence Code.' [Citation.]" (*People v. Phillips* (2000) 22 Cal.4th 226, 238 [92 Cal.Rptr.2d 58, 991 P.2d 145].) The trial court retains the discretion to exclude irrelevant evidence. (*People v. Marlow, supra,* 34 Cal.4th at p. 152.) We address each challenged ruling in turn.

#### a. *Direct Testimony of Defendant's Mother*

Defendant's mother was the first defense witness. She testified after Christine Hougan testified about the impact her mother's death had on her. Defense counsel asked defendant's mother whether there was "something you wanted to say first before we got to the formal questioning?" The prosecutor objected that there was no question pending and the trial court sustained the objection. Defense counsel then asked, "Did hearing Christine Hougan's testimony move you to want to say something?" Defendant's mother responded "Yes" and defense counsel inquired "What's that?" The prosecutor objected and the trial court sustained the objection on relevance grounds. The parties then approached the bench.

The trial court said it suspected that defendant's mother, like everyone in the courtroom, felt bad for Christine Hougan, but the fact that she felt sorry for the victim's family was neither relevant nor admissible as mitigating evidence. Defense counsel argued that the testimony was relevant to the

---

[11] In light of this conclusion, we need not consider whether the trial court was correct in excluding the proposed testimony as speculative and as the improper subject of expert testimony.

[12] While defendant did not object at trial on constitutional grounds, these claims are not forfeited on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) Defendant merely contends that the rulings, in addition to being wrong for reasons actually presented to the trial court, also violated the federal Constitution.

credibility of defendant's mother. Counsel explained that defendant's mother would testify that it was very hard and that "if she could undo it herself, she would." The trial court ruled that defense counsel was trying to demonstrate the character of defendant's mother, which was irrelevant.

 Defendant contends the trial court erred by excluding relevant evidence concerning the credibility of defendant's mother, violating his rights under state law and the federal Constitution. We disagree. Evidence Code section 780 permits credibility evidence "that has any tendency in reason to prove or disprove the *truthfulness* of [the witness's] testimony." (Italics added.) Defendant does not explain how his mother's desire to "undo" the murder was relevant to her truthfulness. The trial court did not abuse its discretion in concluding the testimony was irrelevant. (*People v. Marlow, supra,* 34 Cal.4th at p. 152.)

### b. *Direct Testimony of Rick Wentworth*

Rick Wentworth, an elder in the Jehovah's Witnesses church, was called as a defense witness. Wentworth testified that he was asked to visit defendant in jail and that they established a relationship. He testified that defendant expressed an interest in Bible study and that he visited defendant about three times a month over the previous year and a half. Wentworth and defendant discussed family, friends in the congregation, and then had a formal study. Defense counsel then asked Wentworth whether defendant discussed any concerns about his own plight and Wentworth answered "no." Defense counsel asked "What areas has he expressed concern about to you?" The prosecutor objected and asked to approach the bench. Defense counsel said that Wentworth would testify that defendant had "expressed concern about his family—that's all—and how they're handling it." The prosecutor said the testimony constituted improper testimony about the impact on defendant's family and was also hearsay. The trial court agreed that it appeared to be hearsay. Defense counsel replied that the testimony fell into the state of mind exception (Evid. Code, § 1250). The trial court responded that, even so, it was irrelevant.

Defendant argues that the trial court erred and we agree. Evidence that defendant was concerned about how his family was doing was relevant in mitigation "because it constitutes indirect evidence of the defendant's character." (*Ochoa, supra,* 19 Cal.4th at p. 456.) However, even assuming the error violated defendant's constitutional rights, the erroneous exclusion of the evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Defendant introduced ample alternative evidence of his relationship with his family.

Defendant's wife testified extensively about her love for him, how he had wanted to plead guilty to avoid causing more pain for his family, his character, and his relationship with her and with his children. Additionally, Dr. Kaser-Boyd testified at length about the children's bond with defendant, their love for him, and how they would benefit from a continuing relationship if he were allowed to live. Thus, even without the excluded testimony, the jury was presented with substantial evidence of defendant's relationship with his family and his concern for them. There is no reasonable possibility that the jury would have returned a different sentence even if Wentworth had been permitted to testify that defendant had inquired after his family's well-being.[13]

### c. *Cross-examination of Defendant's Wife*

During the prosecutor's cross-examination of defendant's wife, the prosecutor asked whether she was encouraging the relationship between defendant and his children because she thought it would help him and she answered, "No, not true at all." The prosecutor then asked whether she had ever brought the children to court and she said that, while she had not, someone else had. The prosecutor asked "Was the purpose of bringing your children here to court to give—," at which point the court interjected that the prosecutor's question called for speculation because the witness had testified that she did not bring the children to court. The prosecutor continued cross-examining defendant's wife who testified that she was aware the children had been brought to court. The prosecutor then began, "You relinquished the children to somebody—," whereupon defense counsel objected and asked to approach the bench.

Defense counsel argued the prosecutor was improperly insinuating that the children were "brought to court to be spectacles to the jury which I think is improper and prejudicial and has very little probative value." The prosecutor countered that, "If she allowed the children to be brought to court and knew that was the purpose it goes to her bias and goes to her willingness to use her kids for show." The prosecutor also pointed out that defense counsel had mentioned the children's presence in court in the opening statement. The trial court ruled that the prosecutor could ask whether defendant's wife allowed the children to be brought to court, but not whether they were brought by another person. The prosecutor continued his cross-examination, asking whether defendant's wife had allowed the children to be brought to court, to which she answered "Yes."

---

[13] As we noted in *People v. Jones* (2003) 29 Cal.4th 1229, 1264, footnote 11 [131 Cal.Rptr.2d 468, 64 P.3d 762], "[o]ur state *reasonable possibility* standard is the same, in substance and effect, as the [*Chapman*] *harmless beyond a reasonable doubt* standard . . . ."

Defendant argues the trial court erred in admitting irrelevant testimony that was more prejudicial than probative. We disagree. The question was relevant to the witness's credibility. Defendant's wife had testified that she encouraged the contact between defendant and his children and that she wanted to stay married because she thought it would help defendant. Whether she also intended to help him by encouraging his relationship with his children or allowing them to be brought to court was relevant to her credibility. (Evid. Code, § 780, subd. (f).) We also disagree that the question and witness's response were more prejudicial than probative. There was no risk of prejudice since, even without the testimony, the jury could have inferred from the children's presence in court that their mother had allowed them to attend. The testimony, on the other hand, was probative of the witness's credibility. The trial court did not err.

### d. *Cross-examination of James Waltz*

James Waltz, an attorney and a Jehovah's Witness, was called by the defense and testified on direct examination that he had been asked by defendant's wife's grandmother to speak with defendant in jail regarding a disagreement between defendant and his attorneys over whether defendant should plead guilty. Waltz testified that he advised defendant of the legal and religious aspects of going to trial, ultimately recommending that defendant cooperate with his attorneys.

On cross-examination, Waltz acknowledged that he knew defendant had been charged with a capital crime when he went to meet with him. He also testified that he was a devout member of the Jehovah's Witnesses church. The prosecutor then asked a series of questions about whether Waltz was personally opposed to the death penalty. Defense counsel objected on relevance grounds, but the objection was overruled. In response to a question asking whether he would "ever vote for the death penalty," Waltz answered "No." The prosecutor continued, "And isn't that, in part, your Jehovah Witness connection with the defendant and your opposition to the death penalty, aren't those really the reasons why—," to which Waltz responded, "I'm not opposed to the death penalty." The prosecutor followed up, "You just personally would never vote for it. Is that right?" and Waltz answered, "Correct."

Defendant contends the trial court erred in permitting the prosecutor to ask these questions, arguing that the testimony was irrelevant and more prejudicial than probative. We disagree. The witness's personal philosophical opposition to the death penalty is relevant to his credibility. (Evid. Code, § 780, subd. (f); see *People v. Mickle* (1991) 54 Cal.3d 140, 196 [284 Cal.Rptr. 511, 814 P.2d 290] [expert's philosophical views on capital punishment might disclose bias].) Defendant's claim that the testimony was more prejudicial

than probative is forfeited by his failure to object on that ground at trial. (*People v. Ashmus* (1991) 54 Cal.3d 932, 972, fn. 10 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Even were the claim not forfeited, it is without merit. The value of giving the jury a full and accurate view of Waltz's credibility was not substantially outweighed by the probability of a substantial danger of undue prejudice. (Evid. Code, § 352.)

Defendant claims the above evidentiary rulings, singly and cumulatively, violated his constitutional rights. We disagree. The trial court's exclusion of Wentworth's statement was the only error and it does not require reversal.

### 4. *Prosecutorial Misconduct During Cross-examination*

Defendant argues that, during the cross-examination of two defense witnesses, the prosecutor committed misconduct by improperly insinuating defendant had committed other crimes. He contends the alleged misconduct violated state law and the federal Constitution, requiring reversal. We disagree.

### a. *Background*

Defendant identifies four alleged examples of misconduct. The first instance occurred during the prosecutor's cross-examination of Jenks Janes, a Jehovah's Witness and recovering addict who testified on direct examination that he took defendant to an Alcoholics Anonymous meeting in August or September 1994. On cross-examination, Janes testified that defendant wanted to go to the meeting because he wanted to turn his life around and that Janes believed defendant to be sincere. The prosecutor then asked whether defendant had expressed any other reason for going to the meeting and whether defendant had told Janes that he had been ordered to attend such meetings. Janes answered "no" to both questions. The prosecutor sought to have a document marked as an exhibit and the court asked the attorneys to approach the bench.

At sidebar, the prosecutor said she had a certified copy of a court order, dated October 11, 1994, requiring defendant to attend two Alcoholics Anonymous meetings per week. She intended to ask the witness whether defendant had ever told him that he had been ordered to attend meetings. Defense counsel argued the document was hearsay and pointed out that the order's date was after the meeting discussed by the witness. The prosecutor noted the timing did not mean defendant was not aware, prior to the order, that he would be ordered to attend the meetings. Defense counsel argued it was irrelevant and requested an admonition because the reference to the order had "created a false impression of the facts." The prosecutor said defendant had been

arrested for driving under the influence in August 1994 and one could infer he had a motive for attending the meetings other than turning his life around.

The court was dubious of the prosecutor's rationale and was concerned about the order being dated months after the Alcoholics Anonymous meeting about which the witness was testifying. The trial court said it would admonish the jury that there was no order that defendant attend an Alcoholics Anonymous meeting in August 1994. While the court acknowledged that evidence of defendant's arrest was relevant to defendant's motivation for attending the meetings, it concluded that the prosecutor's mention of a court order suggested that not only had defendant been arrested, but that he had also been convicted and had a prior crime. Accordingly, the court concluded that further testimony about the arrest or the order would be more prejudicial than probative.

The trial court admonished the jury, reminding it that questions are not evidence and that it should not make any assumptions based on a question being asked. Additionally, the court told the jury that "[s]pecifically as to any court orders, you should disregard any question with respect to that and not draw any inferences that there was ever any court order." In response to defense counsel's request, the court further clarified that, "[y]ou should not assume that because there is no evidence that there was such a court order." The cross-examination proceeded and the prosecutor did not return to the topic.

The second alleged instance of misconduct occurred later the same day during the prosecutor's cross-examination of defendant's wife. On direct examination, defendant's wife testified defendant told her, after he had been arrested for murdering Evans, that he had also raped Pamela B. On cross-examination, the prosecutor inquired about the night defendant raped Pamela B. After asking some initial questions about the events of the evening, the prosecutor asked whether the witness suspected defendant had committed the rape and defendant's wife answered "No." The prosecutor then asked, "Does he have a ninja mask?" The witness answered, "No."

The third alleged instance of misconduct also occurred during the cross-examination of defendant's wife. The prosecutor questioned defendant's wife about defendant's drug use. The witness testified defendant used drugs throughout most of her pregnancy with their younger child and during his relationship with his stepson. The prosecutor asked whether defendant was "spending the money that he made at work, in part, on drugs." The witness responded, "Some of it." After eliciting testimony that defendant and his wife had been experiencing financial problems and that it was expensive to raise

two children, the prosecutor asked, "[b]ut he was spending some of the money on his choice, which was methamphetamine. Is that right?" The witness answered, "Yes." The prosecutor asked, "How was he getting all this money to support this drug habit that he had?" and the witness responded, "From work." Later the prosecutor asked a series of questions about defendant's conduct around the time of the rape and the murder in an effort to show that defendant was not remorseful or affected by the crimes he had committed. As evidence, the prosecutor elicited testimony that defendant had, in the days after killing Evans, purchased a brand new Toyota, was not "crying himself to sleep at night," and took his wife out for a romantic dinner.

The fourth alleged instance of misconduct also came during the cross-examination of defendant's wife. The prosecutor asked defendant's wife a series of questions about photographs of defendant and his family that had been admitted into evidence. The prosecutor elicited that one of the photographs, taken in 1991, showed defendant with long hair. The prosecutor then began to show the witness a photograph to see whether it accurately reflected the way defendant used to look. Defense counsel requested a sidebar at which she challenged the relevance of the photograph. The prosecutor explained the photographs showed defendant had changed his appearance, including the length and color of his hair, from time to time. The prosecutor argued defendant's altering of his appearance "shows a manipulative kind of character." The trial court was unconvinced, but did not rule on the objection nor did defendant press for a ruling. Back in front of the jury, the prosecutor asked the witness whether defendant had changed his appearance. Defense counsel objected on relevance grounds and the trial court sustained the objection.

At the conclusion of the day's testimony, after the jury had been excused, the trial court indicated it had some concerns. The trial court said that, during the guilt phase closing arguments, the prosecutor told the jury, "I'm sure you have many questions in your mind. If you don't now, you will in the course of deliberation. And at the conclusion of this phase, the next—I won't be able to talk to you at the conclusion of this phase. But at the end of your service on this case, I'll be available to answer any questions that you have." The next day, defense counsel objected and requested an admonition, arguing that the prosecutor's closing argument had implied that there was additional evidence indicating defendant's guilt that the prosecutor could discuss with the jury at the conclusion of the case. The prosecutor explained that she was merely referring to a general ability to talk to the jury and answer any procedural questions. The trial court credited the explanation and denied defendant's request for an admonition and a mistrial.

The trial court now expressed its concern that, in light of the prosecutor's comments during the guilt phase closing argument, the questions about

defendant changing his appearance and about the source of his money could invite a defense argument that the jury was being urged to speculate whether there were other crimes. The prosecutor responded that, regarding defendant's finances, she was merely trying to show that defendant was choosing to spend his income from work on drugs rather than on his children, and not to imply anything else. Regarding her comments at sidebar about how defendant's change in appearance could be evidence of manipulative behavior, the prosecutor said she noticed the way the court looked at her and she decided to "rethink that area." Regarding the questions about the "ninja mask," the prosecutor argued that whether defendant's wife noticed a mask went to the witness's credibility. Defense counsel pointed out that there had never been testimony about a mask, but rather of a T-shirt that was tied around defendant's face "ninja style." The court indicated it had no problem with the ninja question in light of Pamela B.'s testimony. Defense counsel explained that she did not object to the question about defendant's spending of money because it was phrased in a way that made it clear that it referred to defendant's decision to spend money on drugs rather than his children and "the answer was not a problem." The court adjourned for the day.

The following morning, defense counsel moved for a mistrial based on prosecutorial misconduct. Defense counsel identified four alleged instances of misconduct: (1) the prosecutor's mention of a court order in relation to defendant's motive for attending an Alcoholics Anonymous meeting; (2) the prosecutor's question about a ninja mask; (3) the prosecutor's questions regarding where defendant got the money to purchase drugs and regarding his purchase of a new Toyota; and (4) the questions regarding defendant changing his appearance. Defense counsel argued that, cumulatively, the prosecutor's questions invited the jury to draw an inference that "this person is going out with a ninja mask and other crimes are being done . . . and there are all kinds of crimes nobody knows about . . . ."

The prosecutor responded that the questions regarding defendant's motive for going to the Alcoholics Anonymous meetings were relevant and reasonable in light of the timing of defendant's arrest and Janes's memory of the timeline. She also pointed out that the trial court had admonished the jury to disregard the mention of the court order. Regarding the reference to the ninja mask, the prosecutor pointed out that Pamela B. had herself described the face covering defendant was wearing during the rape in similar terms. With regard to defendant's spending, the prosecutor explained that she wanted to show defendant was choosing to spend his money on drugs, rather than on his children, and that her question about where the money came from was merely to see whether defendant had been taking the money from other sources such as a savings account or an inheritance. With regard to defendant changing his appearance, the prosecutor pointed out that Pamela B.'s neighbor had told the police that she thought defendant's wife dyed his hair after the rape. The

prosecutor thought evidence of defendant changing his appearance, especially with his wife's help, went both to defendant's lack of remorse as well as his wife's bias.

After listening to both counsel's arguments, the trial court concluded that there was not sufficient evidence to demonstrate prosecutorial misconduct and denied the request for a mistrial. The trial court concluded that evidence of defendant spending money on drugs instead of his children despite limited financial resources was probative. Additionally, evidence that defendant changed his appearance immediately after the rape was probative of his lack of remorse. While the court felt that evidence of defendant's motivation for attending Alcoholics Anonymous meetings was relevant, it concluded that evidence about the court order was more prejudicial than probative. However, the court noted that it had already adequately admonished the jury. Defense counsel asked the court to admonish the jury that there was no other criminal activity related to other factors in the case and, in response, the court invited defense counsel to submit a proposed special instruction. The court, at defense counsel's request, also directed the prosecutor to limit questions about defendant's finances to the limited nature of the resources, rather than the source of the money. The court also excluded any further questioning with respect to defendant's occasional changing of his appearance, but concluded that evidence of defendant changing his appearance immediately after the rape was permissible. The penalty phase proceeded.

Defendant did not submit a proposed instruction to the trial court admonishing the jury that there was no other criminal activity related to other factors in the case.

### b. *Analysis*

Defendant argues that the prosecutor committed prejudicial misconduct by asking questions of Jenks Janes and defendant's wife that improperly implied defendant had committed other crimes. He further argues the trial court erred by denying his motion for a mistrial and concludes that the misconduct and denial of his motion for a mistrial require reversal of the penalty verdict. We disagree.

At the outset we note defendant has forfeited this claim. After the trial court denied his motion for a mistrial, defendant asked the court to admonish the jury that there was no other relevant criminal activity. In response, the court invited defendant to submit a proposed instruction to give to the jury. Such an instruction could have cured any potential harm by informing the

jury there was no evidence defendant had committed other crimes. Defendant's failure to submit an instruction, even after the court invited him to do so, forfeits the claim.[14] (*People v. Earp, supra,* 20 Cal.4th at p. 858.)

Even were the claim not forfeited, we conclude it is without merit. Regarding the cross-examination of Janes, defendant argues the prosecutor committed misconduct by attempting to elicit inadmissible evidence about defendant's conviction for driving under the influence. We disagree. The point of the prosecutor's question was to establish that defendant had an alternative motive for going to Alcoholics Anonymous meetings, not to prove he had been convicted of another crime. This was, as the trial court acknowledged, a logical inference that reasonably could be drawn from the evidence. (*People v. Stewart* (2004) 33 Cal.4th 425, 491–492 [15 Cal.Rptr.3d 656, 93 P.3d 271].) Additionally, even if the question was improper, defendant suffered no prejudice. The trial court sustained defendant's objection and admonished the jury to disregard the question and not draw any inferences from it. We assume the jury followed the admonition and that prejudice was therefore avoided. (*People v. Jones, supra,* 15 Cal.4th at p. 168.) Moreover, while the question made reference to defendant's being "ordered" to go to meetings, it made no mention of a *court* order.[15] Further, the court specifically admonished the jury there was no evidence of a court order. Thus, there is no " 'reasonable likelihood that the jury construed or applied any of the [prosecutor's] complained-of remarks in an objectionable fashion.' [Citation.]" (*Ochoa, supra,* 19 Cal.4th at p. 427.)

Regarding the prosecutor's mention of a "ninja mask," defendant argues the prosecutor insinuated defendant kept a mask to "disguise himself while committing more crimes." To the contrary, the brief reference obviously alluded to Pamela B.'s description of the disguise defendant used during the sexual assault.[16] For that reason, the trial court stated, "I don't see the ninja mask question being particularly significant." The question did not constitute misconduct. Nor is there a reasonable likelihood the jury interpreted the question to mean defendant kept a ninja mask for use in a crime spree.

Regarding the question about defendant's money, defendant argues the prosecutor implied defendant "was out committing other robberies and burglaries" to obtain money. We disagree. With regard to the source of

---

[14] Alternatively, defendant could have pressed the trial court to rule on the request for an admonition regarding the absence of other criminal activity.

[15] Similarly, while the prosecutor said in open court that she had "a document" she wanted marked as an exhibit, she did not say, in front of the jury, the document was a court order.

[16] Pamela B. was asked to describe how defendant covered his face with a T-shirt. Pamela B. responded, "I've used the term 'ninja style' before. It's—it covered his head completely."

defendant's money, in context it is clear the question was part of an effort to show defendant chose to spend his limited resources on drugs rather than on his children. Indeed, in explaining her decision not to object to the question, defense counsel admitted as much. The question therefore did not constitute misconduct. Moreover, defendant suffered no prejudice. It was a single, brief question, defendant's wife's answer indicated the source of defendant's money was his job, and the prosecutor moved on without following up.

The same is true of the prosecutor's reference to defendant purchasing a new Toyota. The prosecutor was asking questions in an effort to show defendant was not acting remorseful or as if he had been affected by his commission of the crimes. To that end, the prosecutor elicited that defendant had taken his wife out for a romantic dinner, was sleeping well at night, and purchased a new Toyota. The reference to defendant purchasing a new Toyota was clearly intended to establish defendant was living a normal life, not that he was spending money other than that earned at work. The statement did not constitute misconduct. Additionally, there is no reasonable likelihood that the jury construed the stray reference to the new Toyota to mean defendant was engaged in a crime spree to get more money.

Regarding the question about the change in appearance, defendant argues the prosecutor committed misconduct by insinuating defendant was disguising himself in order to commit other crimes. We disagree. At sidebar, the prosecutor explained she thought defendant's changes in appearance were probative of his "manipulative kind of character." While the trial court was doubtful of the prosecutor's theory of relevance, it did not rule on defendant's objection nor did defendant press for a ruling. Back in front of the jury, the prosecutor asked the witness whether defendant had changed his appearance over the course of their relationship. Defense counsel immediately objected and the trial court sustained the objection. There was no misconduct. First, the prosecutor did not insinuate defendant was disguising himself to commit other crimes and there is no reasonable likelihood the jury construed her question in such a fashion. Second, the prosecutor did not violate a court order as the trial court did not rule on defendant's objection and defendant failed to press for a ruling. Third, even if the prosecutor's question was misconduct, defendant suffered no prejudice. It was a brief question, defendant's objection was immediately sustained before the witness answered, and the prosecutor did not return to the subject.

Because we conclude the complained-of remarks did not constitute misconduct, either cumulatively or on their own, we also conclude the trial court did not err in denying defendant's motion for a mistrial. That decision is within the sound discretion of the trial court (*People v. Price, supra,* 1 Cal.4th at p. 430) and the trial court did not abuse its discretion here.

### 5. *Prosecutorial Misconduct During Closing Argument*

Defendant identifies numerous alleged examples of prejudicial misconduct committed by the prosecutor during her penalty phase closing argument. Specifically, defendant claims reversal is required because the prosecutor mischaracterized the evidence, speculated about defense strategy, ignored the trial court's rulings, and argued facts not in evidence. We disagree.

The prosecutor began her closing argument by discussing defendant's rape of Pamela B. The prosecutor argued that, when Pamela B. tried to escape from defendant, he "lunged toward her with the knife." Defense counsel objected that the argument misstated the evidence. The trial court did not rule on the objection, but nonetheless admonished the jury that it was "the exclusive judge of the evidence." The argument did not misstate the evidence. Pamela B. testified that defendant had a knife in his hand during the entire assault and that, after she escaped and ran outside, defendant chased after her and "lunged at [her]." The prosecutor correctly recounted the testimony or, at a minimum, drew reasonable inferences from the testimony. (*People v. Williams* (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Additionally, we assume the jury followed the court's admonition, avoiding any prejudice. (*People v. Jones, supra,* 15 Cal.4th at p. 168.)

The prosecutor later addressed Dr. Kaser-Boyd's testimony. Discussing the expert's statement that defendant had been "the victim of a child molest[er] . . . the victim of a social system . . . the victim of a dysfunctional family," the prosecutor argued defendant "wants to be the victim. He wants you to see him as the victim." Defense counsel objected. At sidebar, the trial court stated that, so long as the argument was about the defense, rather than defendant, the prosecutor's attack on the mitigation evidence was permissible. We agree. Prosecutors are allowed "wide latitude in penalty phase argument, so long as the beliefs they express are based on the evidence presented. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 613 [47 Cal.Rptr.3d 22, 139 P.3d 492].) The prosecutor's argument was a fair comment on defendant's mitigation evidence, specifically Dr. Kaser-Boyd's testimony, and did not constitute misconduct.

The prosecutor continued to address Dr. Kaser-Boyd's testimony, telling the jury it should reject her opinion because of her failure to use certain tests in assessing defendant. The prosecutor suggested Dr. Kaser-Boyd might have chosen not to give certain tests because she knew they would hurt the defense. Defense counsel objected and the trial court sustained the objection, ruling, "You can't speculate as to defense counsel strategy." The prosecutor then argued that the expert's failure to give certain tests and to talk to defendant about his crimes undermined the value of her opinion. The

prosecutor also argued that, as a result, certain relevant questions could not be asked. Defense counsel objected and the trial court again told the prosecutor not to speculate as to counsel's reasoning process.

The prosecutor continued, specifically identifying particular questions she could have asked the expert had the expert talked to defendant about his crimes. Defense counsel objected and the court asked both counsel to approach and told the prosecutor that she was not permitted to speculate "as to why the defense did this or that." Defense counsel complained that the prosecutor had ignored several of the court's rulings and moved for either a mistrial or an admonition. The trial court indicated that it did not believe the prosecutor had violated a court order, but that she had kept to addressing what the expert had or had not said in her testimony. The trial court ruled the prosecutor could argue that the expert's failure to give certain tests prevented the prosecutor from asking critical questions and, therefore, that the expert's testimony should be given less weight. The trial court agreed that the prosecutor should not speculate about *why* the information was not offered. The trial court denied defendant's motion for a mistrial, but admonished the jury that it should decide the case "based on the evidence and the law" and not "speculate as to why counsel did or did not do something or what they knew or did not know either in evidence or in argument."

Defendant contends the prosecutor committed misconduct by improperly commenting on defense strategy and ignoring the trial court's rulings. We disagree. After the trial court sustained defendant's objection to the prosecutor's hypothesizing about why the expert did not give certain tests, the prosecutor did not return to the subject. She subsequently argued that the expert's testimony should be given less weight due to her failure to give certain tests. As the trial court concluded, such argument was not improper. "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] . . . [A]nd counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Even assuming the prosecutor's comments were improper, the trial court sustained defendant's objection and admonished the jury not to speculate about defense counsel's strategy. We assume any prejudice was thereby avoided. (*People v. Jones, supra,* 15 Cal.4th at p. 168.)

Later in the closing argument, the prosecutor argued that defendant's efforts to stop using drugs and make changes to his life were insincere and hypothesized that defendant's wife "gave him an ultimatum." Defense counsel objected and the trial court sustained the objection. The prosecutor continued, "[d]id he want to appease her. Did he want to—she was contemplating leaving him." Defendant argues the prosecutor improperly argued

facts outside the evidence. We disagree. Initially we note that defendant forfeited this claim because he failed to request an admonition when an admonition would have cured any prejudice. (*People v. Earp, supra*, 20 Cal.4th at p. 858.) Moreover, the argument was fair comment on defendant's wife's testimony that she and defendant were having martial problems, she was contemplating leaving him, and she demanded he quit using drugs. Additionally, the prosecutor is afforded wide latitude in penalty phase closing argument and her argument about defendant's possible motivation for making changes was based on permissible inferences from the evidence. (*People v. Cook, supra*, 39 Cal.4th at p. 613; *People v. Williams, supra*, 16 Cal.4th at p. 221.)

While discussing the testimony of defendant's family members and arguing the witnesses were biased, the prosecutor commented on defendant's failure to call "his best friend Troy Clark" as a witness. The prosecutor reminded the jury of testimony that Clark was the person who knew defendant best, "but they didn't call his best friend who if they were going to try to portray to you—." Defense counsel objected, noting "[w]e don't know where Mr. Clark is." The trial court told the prosecutor she could not speculate about why witnesses were not called or suggest that she knew why witnesses were not called. The prosecutor continued, arguing that "there are individuals out there that know the defendant, have had more exposure to the defendant than the people the defense called as witnesses, and if you didn't hear from those people you have to ask yourselves why not." Defendant's failure to request an admonition when doing so would have cured any prejudice forfeits this claim. (*People v. Earp, supra*, 20 Cal.4th at p. 858.) Additionally, the prosecutor did not commit misconduct by arguing that defendant's family members were biased and by commenting on defendant's failure to call witnesses that knew defendant best. (*People v. Davis* (1995) 10 Cal.4th 463, 539 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

Defendant next claims the prosecutor committed misconduct by misstating the testimony regarding defendant's confession to his mother, Rita Bennett. Not so. The pages of the record cited by defendant relate to defendant's confession to his *wife*, Karen Bennett, *not* his mother, Rita Bennett. Although the prosecutor's reference to "Ms. Bennett" could be understood to mean either defendant's wife or his mother, the prosecutor clearly identified defendant's wife, Karen Bennett, as the subject of that portion of her argument. Moreover, in response to defendant's objection that the prosecutor had misstated the evidence, the trial court admonished the jury that it should follow the evidence as the jury believed it to be. We assume the jury followed the court's admonition, avoiding any prejudice. (*People v. Jones, supra*, 15 Cal.4th at p. 168.)

The prosecutor next addressed testimony about defendant's confession to his wife. Recounting the wife's testimony, the prosecutor noted that she said defendant had not given her many details about his crimes, but had told her that Evans had hit him in the head with a clock. Reminding the jury that defendant had allegedly confessed the rape and murder within the space of an hour-long conversation, the prosecutor remarked that it would have been odd for defendant to have told his wife the detail about being hit with a clock. The prosecutor then argued, "Now, more than likely she made that up because there had been testimony about the photo and the clock." Defense counsel objected that the argument was improper, and the court ruled that "the more than likely is improper." Defendant forfeited the misconduct claim by failing to request an admonition. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) In addition, the prosecutor's argument did not constitute misconduct. It was permissible to argue based on the evidence that the testimony was not credible. (*People v. Dennis, supra,* 17 Cal.4th at p. 522; *People v. Williams, supra,* 16 Cal.4th at p. 221.)

The prosecutor then addressed the testimony of James Waltz, arguing that he was biased because "[h]e's involved with this family here and he doesn't believe in the death penalty." Defense counsel objected that the prosecutor had misstated the evidence, and the trial court sustained the objection. The prosecutor continued, arguing that Waltz "doesn't support the death penalty. He said he could never vote for the death penalty regardless of what the case was." Defendant did not request an admonition and thus forfeited the claim. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Additionally, the prosecutor did not commit misconduct. Waltz testified that he would never vote for the death penalty under any circumstances, and the prosecutor's argument that Waltz was biased because of his ties to defendant's family and his stance on the death penalty constituted fair comment on the evidence. (*People v. Williams, supra,* 16 Cal.4th at p. 221.)

The prosecutor returned to discussing the circumstances of the crime and invited the jury to speculate about Evans's final moments. "That poor woman was raped and bludgeoned, beaten. Don't you think she begged for mercy, if she couldn't verbally, don't you think she cried out with her eyes." Defense counsel objected that the argument was speculative and the court said that, unless it was supported by the evidence, the prosecutor could not argue it. The prosecutor continued, "We know she was alive during this period of time. We know she didn't consent to her murder and her bludgeoning." Defendant failed to request an admonition and so forfeited the misconduct claim. (*People v. Earp, supra,* 20 Cal.4th at p. 858.) Moreover, the prosecutor's argument did not constitute misconduct. As she explained, her argument that the victim likely sought mercy was a reasonable inference from evidence in the record. (*People v. Williams, supra,* 16 Cal.4th at p. 221; *People v. Scott* (1997) 15 Cal.4th 1188, 1220 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

At the close of her argument, the prosecutor anticipated defendant's closing argument by saying, "Now he's going to come in through his defense attorneys—when I sit down here sometime today. They'll talk to you tomorrow and ask you through the defense attorneys [*sic*] do him a favor of not giving him the death penalty and I ask you please don't do that. Do not give this man what he wants." Defense counsel objected that there was no evidence about what punishment defendant wanted and the trial court sustained the objection. The misconduct claim is forfeited due to defendant's failure to request an admonition when an admonition would have cured any prejudice. (*People v. Earp, supra*, 20 Cal.4th at p. 858.) Additionally, arguing that defendant did not want to be sentenced to death did not constitute an unreasonable inference from the evidence. (*People v. Williams, supra*, 16 Cal.4th at p. 221.) Moreover, while prosecutorial comment on what punishment a defendant wants may not be proper, no conceivable prejudice could have resulted from the brief remark.

Accordingly, we conclude the complained-of remarks did not constitute reversible misconduct.

### 6. *Cumulative Effect of Prosecutorial Misconduct*

Defendant contends the numerous alleged instances of prosecutorial misconduct rendered his trial fundamentally unfair, in violation of his federal constitutional right to due process and a reliable verdict. We disagree. Having found no prosecutorial misconduct, we conclude there was no cumulative effect.

### 7. *Cumulative Error*

Defendant contends the cumulative prejudicial effect of the various penalty phase errors he has raised on appeal requires reversal of his death sentence. With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error.

### C. *Juror Misconduct Issues*

### 1. *Juror No. 84*

Defendant contends the trial court erred by failing to excuse Juror No. 84, thereby violating state law and the Eighth and Fourteenth Amendments to the federal Constitution. Specifically, defendant argues reversal is required because the trial court should have excused Juror No. 84 for being unable to perform her duty. We disagree.

After the trial commenced, the court told the jury it anticipated the trial would conclude by the end of Labor Day week. On August 16, 1996, during the penalty phase, the trial court told the jurors that closing argument would likely occur the day after Labor Day, with deliberations to begin thereafter, and if any of the jurors had any problem with the case going into the week of September 9, they should notify the bailiff. The court then recessed until August 26.

On August 29, the jurors were excused early and told to call the court clerk after 4:00 p.m. to see whether they should return on Friday, August 30 or Tuesday, September 3. After the jury exited the courtroom, the trial court advised counsel that Juror No. 84 indicated that, because she was the office manager of an elementary school, it would be difficult on the new students and the staff if she were not at school when the teachers returned on September 9. Defense counsel, concerned that deliberation might be affected if Juror No. 84 remained, requested that the juror be excused and an alternate be seated. The prosecutor asked the trial court to wait and see whether a problem would actually arise. Ultimately, the trial court agreed with the prosecutor and decided not to excuse the juror.

When the jurors called on August 29 to see when they should return, they were informed they should return on September 3. When Juror No. 84 called, the juror told the court clerk she was not happy that she had to return on Tuesday. The court clerk surmised the juror was unhappy because she had wanted to come back on Friday, August 30, and the court described the juror as being disappointed that the jury was not returning until September 3, instead of August 30. Defense counsel asked the court to voir dire the juror and the court agreed.

When the jury returned on September 3, the court told Juror No. 84 that it needed to talk to her, but would do so during a break. At the end of the day, outside the presence of the other jurors, the trial court told Juror No. 84 that it received her note and appreciated her concerns. "Your commitment to your job and your concerns about your job demonstrate you're a responsible person and when you've got a job to do you're going to do it, so that tends to cause us to believe you'd be a good juror because you understand your obligations and are true to them, but I'm very concerned with respect to divided attention, and the law sets up certain standards for me to review in terms of whether a juror should be excused on the basis of hardship, and I guess what I need to know from you is . . . whether you'll be distracted.

"Juror No. 84: No, I just felt like I've already given up my summer vacation for this and I've got almost seven hundred students to worry about and a staff of sixty.

"The court: When you say I've already given up my summer vacation for this, it has been a hardship and I need to know either based on that you think subconsciously you would move more quickly either towards reaching a verdict or more quickly towards declaring an impasse saying we can't reach a verdict. Again, I know you won't consciously do that, but—

"Juror No. 84: I don't even think subconsciously that would be a problem.

"The court: Because I know sometimes if I'm in a hurry to get out of here on Friday afternoon when I come back Monday and look at something I wrote, I think I didn't spend a—

"Juror No. 84: I understand what you're saying. That's not a problem.

"The court: So if you are required to remain to the conclusion of the case, it could be two or three weeks into the school year.

"Juror No. 84: I understand.

"The court: You still feel you'd be able to approach this task with the same commitment you've had throughout the trial?

"Juror No. 84: Sure.

"The court: You won't be distracted wondering what's happening in school?

"Juror No. 84: Of course I'll be wondering what's happening at school, but it's just—really, I feel strongly about continuing.

"The court: Continuing on the jury?

"Juror No. 84: Yes

"The court: And maintaining your focus on the jury?

"Juror No. 84: Yes."

The next day, after defense counsel finished their closing argument, the court excused the jury and asked counsel for feedback regarding Juror No. 84 while indicating that it "thought [Juror No. 84] made it pretty clear that she would continue to perform her duties as a juror in a competent fashion . . . ." Defense counsel continued to believe the juror should be excused and the prosecutor thought the juror should remain. The court decided not to excuse

the juror, explaining that, "Based on what she said yesterday, although I initially had some concerns, after talking with her yesterday I think she appreciates the seriousness of her duties in connection with this case. And I'm not concerned that she will rush to a verdict or rush to an impasse in an effort to end her jury service." The jury began deliberating later that day, continued to deliberate on Thursday, September 5 and Friday, September 6, stopped for the weekend, and reached a verdict on Monday, September 9.

Defendant claims the trial court erred when it decided not to excuse Juror No. 84. We disagree. Section 1089 authorizes the trial court to discharge a juror at any time before or after the final submission of the case to the jury if, upon good cause, the juror is "found to be unable to perform his or her duty." A trial court "has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve." (*People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19 [74 Cal.Rptr.2d 418, 954 P.2d 990].) A juror's inability to perform " 'must appear in the record as a "demonstrable reality" and bias may not be presumed.' [Citations.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 975 [39 Cal.Rptr.2d 607, 891 P.2d 153].) We review the trial court's determination for abuse of discretion and uphold its decision if it is supported by substantial evidence. (*People v. Boyette* (2002) 29 Cal.4th 381, 462 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

Here, the juror never indicated at any point that her ability to deliberate would be affected by her concern about the impending school year. To the contrary, on numerous occasions, she affirmatively indicated she would not be distracted, would not feel pressure to reach a decision, and would not lose focus because of her job. Indeed, she told the court she felt strongly about remaining on the jury. The court was in the position to observe the juror's demeanor (*People v. Schmeck* (2005) 37 Cal.4th 240, 298 [33 Cal.Rptr.3d 397, 118 P.3d 451]) and the court was persuaded that the juror could perform her duties. Defendant speculates the juror was biased; however, nothing in the record supports his assumption. (*People v. Beeler, supra*, 9 Cal.4th at p. 975.) Accordingly, we conclude the court did not abuse its discretion in declining to excuse Juror No. 84.

### 2. *Juror No. 20*

Defendant argues the trial court erred when it allegedly failed to adequately examine Juror No. 20, failed to excuse Juror No. 20, and declined to reinstruct the jury. Defendant contends reversal is required because his rights under state law and the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution were violated. We disagree.

At 10:00 a.m. on September 9, the jury informed the court it had reached a verdict. The court excused the jury until 2:00 p.m. Before taking the verdict, the court called counsel into chambers and told them that, at 1:40 p.m., Juror No. 20 called the courtroom and spoke with the bailiff. The bailiff, who was in chambers, recounted that "The gist of the phone call was that [Juror No. 20] had a concern as to what was taking place in the jury room. At that point I told him if there's any problems you need to write them down and I will forward them up and he said he just didn't feel right and once again I told him to write it down and, you know, if he had any problems he had to put it on paper and I would pass it on." The trial court then indicated that Juror No. 20 did not give the bailiff a note when he, along with the other jurors, assembled in the jury room.

The trial court was unsure whether it should inquire of Juror No. 20. Defense counsel felt an inquiry was necessary and the prosecutor wanted to take the verdict without doing so, reasoning that the juror's failure to write a note must mean any concerns had been resolved. There was a lengthy discussion about how best to proceed and, ultimately, it was decided to bring Juror No. 20 into chambers, reference his phone conversation with the bailiff, and invite him to write down any concerns should he have any. Once Juror No. 20 had been brought into chambers, the court inquired and advised him to write any concerns on a note. The juror did so and then returned to the jury room. The court read the note aloud to counsel: "I have reached a verdict as to the proper verdict. It is just very hard for me to verbally say it when being polled. In my mind I do believe my verdict is true and correct, but my heart tells me I cannot do this. It's very difficult. I don't want this trial to go on any longer, but is there any way that an alternate can take my place to reach a verdict so I won't have to verbally say it. I know I said I could do it, but it's a lot harder than I thought, and if I must do it I will."

The court and counsel discussed the note and discussed what action to take. Defense counsel argued that the note meant Juror No. 20 could not fulfill his oath and asked that he be excused and replaced by an alternate. Alternatively, defense counsel asked the court to tell Juror No. 20 that he should not have signed the verdict form unless he was prepared to state it was his verdict in open court. Defense counsel also asked the court to reinstruct the entire jury, pursuant to CALJIC No. 8.88, that it should only impose the sentence that each juror personally felt was warranted. The prosecutor asked the court to bring the juror into chambers and inquire what he intended to do when polled in open court. Because a verdict had been reached, if the juror intended to agree when polled, there was no problem to resolve. The prosecutor felt further intervention was warranted only if the juror said he intended to disagree when polled. The court ultimately concluded that there were not sufficient grounds to excuse the juror. It instead decided to tell the juror that the jury would be individually polled after the verdict was

announced and to ask him whether he could answer yes. If not, the court could deal with it then. Then, referring to the bailiff's recounting of Juror No. 20's phone call, defense counsel noted that the juror had made reference to "some things going on in the jury room" and asked the court to conduct an inquiry into his concerns. The court pointed out that the statement was merely part of the bailiff's best effort to paraphrase the conversation.

The court then brought Juror No. 20 into open court and told him that, as in the guilt phase, the jurors would be collectively and individually polled after the court clerk read the penalty phase verdict to determine whether the verdict expressed their votes. The court said it did not want to know what the verdict was, but wanted to know if the juror could give an answer when polled. The juror responded, "I think I could do it. It's just, I guess, the nervousness if you want to call it. It would be easier for me—all the jurors. It's not an easy thing. It's difficult to do it, but I can do it. It's just the nervousness was part of my concern." The court followed up, "But when asked in open court if this expresses your verdict you can answer either yes or no?" The juror responded, "Yes" and was returned to the jury room. Defense counsel renewed his motion to excuse the juror and replace him with an alternate and to reinstruct the jury. Finding no good cause, the trial court denied the motion. The jury returned a death verdict and, when polled, Juror No. 20 responded that the verdict reflected his penalty determination.

Defendant argues the trial court erred. He contends the trial court's inquiry was too limited, that the court should have excused Juror No. 20 for inability to fulfill his duty as a juror, and that the court should have reinstructed the entire jury. We disagree.

First, the court did not err when it concluded Juror No. 20 could fulfill his duty. (*People v. Boyette, supra,* 29 Cal.4th at p. 462.) The juror's note and the court's subsequent inquiry established that the juror's concern was about having to state in open court that he felt a death sentence was appropriate. Any such anxiety was understandable given the consequences of his vote. However, the juror subsequently told the court that, while difficult, he could fulfill his duty by verbally affirming that he concurred in the jury's penalty determination. Indeed, the juror ultimately did so. There is no evidence in the record to support the conclusion that the juror was unable to perform his duty.[17] (*People v. Beeler, supra,* 9 Cal.4th at p. 975.)

Second, the court did not abuse its discretion in determining the scope of its inquiry. Defendant argues that Juror No. 20 communicated a

---

[17] The juror made clear that his concern was not about the jury's penalty determination. His note said he felt he had reached the "proper verdict" and that the "verdict [was] true and correct."

broader concern about jury deliberations and it was incumbent upon the court to inquire. The record does not support his contention. The bailiff, in what the trial court described as his best effort to paraphrase the conversation with Juror No. 20, made a vague reference to "a concern as to what was taking place in the jury room." However, despite being instructed to do so by the bailiff, Juror No. 20 did not write a note about any concerns. Even after the trial court brought the juror into chambers and invited him to write down any concerns, the juror's note made no mention of concerns about anything taking place in the jury room. Nor, during the court's subsequent inquiry, did the juror mention any other concerns. " 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. [Citation.]' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 [106 Cal.Rptr.2d 313, 21 P.3d 1225].) Moreover, trial courts should use caution when making inquiries because of the need to protect the sanctity and secrecy of jury deliberations. (*Id.* at p. 475.) In light of the juror's failure to raise concerns about anything taking place during jury deliberations, the court did not abuse its discretion when it chose not to conduct a broader inquiry.

Third and finally, the court did not abuse its discretion when it declined defendant's request that it reinstruct the entire jury with CALJIC No. 8.88. The jury had already been so instructed and nothing suggests the trial court needed to do so again. The jury had already reached a verdict. Nothing in Juror No. 20's note nor in his answers during the court's inquiry called the validity of the verdict into question. Accordingly, the court's decision not to reinstruct the jury was not error.

### 3. *Defendant's Motion for a New Trial*

Defendant claims Juror No. 20 committed prejudicial misconduct during the penalty phase deliberations and that the trial court erred when it denied his motion for a new trial. Defendant further contends that reversal of both his conviction and penalty is required under state law and the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree.

On December 6, 1996, defendant filed a motion for a new trial, alleging Juror No. 20 had committed misconduct. Exhibit A to the motion was a November 26, 1996 declaration, signed by Juror No. 20 under penalty of perjury, in which he stated that, "In 1993 or 1994, I was arrested for my role in a bar fight. I spent two days in jail. The charges were eventually dropped. That experience was very difficult for me." Exhibit B to the motion was the juror's May 8, 1996 voir dire questionnaire, also signed under penalty of perjury, in which he stated that he had never been arrested. Defendant argued Juror No. 20 had committed prejudicial misconduct by lying during voir dire.

At a hearing on the motion, defense counsel indicated that a number of jurors indicated Juror No. 20 had said during deliberations that he had previously been arrested. Defense counsel asked the prosecutor to check whether the juror had any criminal arrests. The prosecutor opposed the request, unsure that he had the authority to obtain the juror's arrest record and provide it to the defense. Moreover, the prosecutor argued that, even assuming the juror had committed misconduct, defendant had not established any prejudice. The trial court concluded further inquiry was warranted.

At subsequent hearings, both the prosecution and defense indicated they had inquired with several law enforcement agencies, but had been unable to locate any booking records for Juror No. 20. Defense counsel indicated that several jurors remembered Juror No. 20 talking about having been arrested. Juror No. 20 had also allegedly expressed "how horrible jail was." Defense counsel argued that one could infer from such a statement either that the juror was advocating a life sentence verdict or that "it's a lot easier to sentence somebody to death if you think jail is so bad anyway." Defense counsel also acknowledged that it was alternatively possible that the "juror made up a story in deliberations then lied on a declaration." The prosecutor indicated that "we have received some information that in fact the juror may not have been arrested in the sense of the word that we would consider an arrest." It was decided that the prosecutor would obtain a declaration from Juror No. 20 addressing the apparent inconsistencies.

At the next hearing on the matter, the court discussed Juror No. 20's most recent declaration, obtained by the prosecution. The court noted that the juror's declaration "appears to suggest that he was not arrested, that he was detained, and he believes it might have been—it was with private security guards who detained him in an office, and it might have been overnight." The court noted that the most recent declaration conflicted both with his previous declaration and with the recollection of the other jurors who clearly remembered Juror No. 20 mentioning "jail." In light of counsel's inability to verify that the juror had been arrested and of the new declaration, the court concluded Juror No. 20 did not lie on his juror questionnaire, but did lie to the other jurors when he told them he had spent time in jail and it was a horrible experience. Addressing whether defendant had suffered any prejudice, the court said its "initial take on it is [Juror No. 20] exaggerated his experience for attention getting." Defense counsel was concerned about exactly what Juror No. 20 said to the other jurors and indicated that Juror No. 20's behavior possibly indicated something about "his state of mind." It was agreed that the court would have the juror come in and the court would further inquire.

At the next hearing, the court questioned Juror No. 20 at length under oath. In addition to inquiring about the alleged incident, the court asked what Juror

No. 20 had said to other jurors during deliberations regarding his experience and Juror No. 20 responded that he had, on two occasions, told a juror in the presence of other jurors, "have you ever been in jail, it's a very difficult—it was for me when I was there." The court took a brief break to allow counsel to propose any additional questions. Upon resumption of the examination, the court asked additional questions about the alleged incident with the security guards.

At the conclusion of the hearing, after considering the evidence and hearing argument from both counsel, the court found that the juror did not lie on his juror questionnaire, but that he did lie when he told jurors he had been arrested and been in jail. The court further found that the juror had made only a brief "mention" of the alleged experience and did not have a "conversation" about it. The court found that the juror had not been truthful when he signed either of the posttrial declarations. The court concluded that the juror committed misconduct when he made a false statement during deliberations. The court further concluded, however, that there was no evidence of prejudice. In addition to the statement being brief, the court explained that jail is commonly known by the public to be a bad place. The court also noted that jail is portrayed as awful in popular media and that the defense had introduced testimony in the penalty phase about the difficulties of life in jail. The court denied defendant's motion for a new trial.

■ Defendant contends the trial court erred when it denied his motion for a new trial. We disagree. At the outset, we note that the trial court found that the juror did not lie on his juror questionnaire and we accept that factual determination, as it is supported by substantial evidence, including the lack of any records indicating defendant had been arrested. (*People v. Ramos* (2004) 34 Cal.4th 494, 520 [21 Cal.Rptr.3d 575, 101 P.3d 478].) As for the juror's posttrial declarations, the court found that the juror had lied in them. However, a juror's postverdict lying to cover up misconduct, "although certainly improper, does not show bias *during the trial, deliberations, and verdict*." (*In re Carpenter* (1995) 9 Cal.4th 634, 657 [38 Cal.Rptr.2d 665, 889 P.2d 985].) Accordingly, only the juror's comments during deliberation constitute potentially prejudicial misconduct. While the court concluded these comments constituted misconduct, it nonetheless decided defendant had not established prejudice.

Misconduct by a juror raises a rebuttable presumption of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 302 [8 Cal.Rptr.3d 767, 82 P.3d 1249].) However, we will set aside a verdict only where there is a substantial likelihood of juror bias. (*Id.* at p. 303.) We will find such bias if the misconduct is inherently and substantially likely to have influenced the jury. Alternatively, even if the misconduct is not inherently prejudicial, we

will nonetheless find such bias if, after a review of the totality of the circumstances, a substantial likelihood of bias arose. (*Ibid.*) While the existence of prejudice is a mixed question of law and fact subject to this court's independent determination, we accept a trial court's credibility determinations and factual findings when they are supported by substantial evidence. (*Id.* at pp. 303–304.)

We conclude Juror No. 20's comments did not create a substantial likelihood of juror bias. First, the trial court found Juror No. 20's comments were brief, and its finding was supported by substantial evidence including both the juror's answers to the court's questions as well as the other jurors' declarations. For example, while Juror No. 17 said Juror No. 20 had stated he had spent a "very short stay" in jail, she indicated she could not recall any specific comments made by Juror No. 20. Similarly, Juror No. 94 told the defense investigator that Juror No. 20 had "mentioned only that he had 'an experience' in jail and that it was horrible," and that the other jurors did not ask for any details nor did she recall any other information on the subject. In short, as the trial court concluded, Juror No. 20's reference to being in jail was merely a fleeting comment.[18]

Second, the trial court concluded that the substance of the juror's brief comment—that jail was "scary" and "horrible"—did not create a substantial likelihood of juror bias. The court noted that jail is already widely understood to be a bad place to be and that it is portrayed as such in "novels, movies, television programs, . . . documentaries." The court also pointed out defense witnesses testified in the penalty phase about unsavory jail conditions. For example, Emedio Sandoval, a convicted child molester, testified that defendant had been attacked by another inmate in jail and also testified about the social hierarchy among inmates. Considering the totality of the circumstances, Juror No. 20's comment that jail was scary and horrible did not create a substantial likelihood of juror bias.

Alternatively, defendant also argues the trial court should have granted his motion for a new trial because Juror No. 20 was unfit to sit on the jury. Citing the juror's numerous lies, defendant claims "something was off with Juror [No.] 20" and that he engaged in "bizarre" and "pathological" behavior. Nothing supports this interpretation. To the contrary, the record suggests the juror first lied to his fellow jurors about having been in jail in order to garner attention and then, once the defense investigator approached him about his comments, the juror understood he had committed misconduct and engaged

---

[18] Defendant contends Juror No. 20 also committed misconduct by holding himself out as a "jail veteran" and by "play[ing] expert" on what jail was like. The evidence does not support defendant's claim—to the contrary, it establishes the comments were brief and were not the subject of further discussion.

in a series of contradictory explanations in an effort to get out of trouble. Nothing other than mere speculation supports defendant's contention that Juror No. 20 was "pathological" or otherwise incapable of performing his duty as a juror. (*People v. Beeler, supra,* 9 Cal.4th at p. 975.) The trial court did not err when it denied defendant's motion for a new trial.

### D. *Other Issues*

#### 1. *Denial of Application to Modify the Penalty Verdict*

Once the jury returned a death verdict, the trial court considered an automatic motion for a modification of the sentence (§ 190.4, subd. (e)), which the trial court denied. Defendant contends the trial court's decision constituted error. Specifically, defendant asserts the trial court's failure to "take into account the proportionality aspect of the death penalty" requires reversal. We disagree.

 A trial court's duty under section 190.4, subdivision (e), is to "independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict." (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) The record demonstrates that the trial court did so here. In aggravation, the trial court discussed the calculated nature of the crimes, the fact that defendant likely chose the women he attacked because he was aware they lived alone, and the brutality of the attacks. The court next identified numerous mitigating factors including, among other things, defendant's lack of criminal history, his addiction to drugs, his childhood, and his devotion to his children. The trial court then independently reweighed the evidence and ultimately concluded that the circumstances of the crime were "so compelling that [their] weight alone substantially outweighed the totality of the mitigating factors." The trial court carefully performed its duty under section 190.4, subdivision (e).

Defendant also argues that the circumstances of this crime were not so bad as to place defendant among "the worst of the worst." To the extent defendant is claiming the trial court erred by failing to compare the crimes in this case with other death penalty cases, we have held such intercase proportionality review is not required by either the state or federal Constitution. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1130 [12 Cal.Rptr.3d 592, 88 P.3d 498]; *People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433].) To the extent he is arguing that his sentence was disproportionate to his personal culpability, we disagree. (*People v. Steele, supra,* 27 Cal.4th at p. 1269.) As the trial court explained, "[defendant] did not randomly select his victims but rather used his special knowledge as a workman or as a

neighbor to assess their vulnerability before he preyed upon [them] . . . . [¶] There was unusual emotional brutality in the rape and forced oral copulation of the first victim. And there was unusual physical brutality in the killing of [Evans]." Defendant's sentence "is not disproportionate to [his] personal culpability. It does not shock the conscience." (*People v. Steele, supra,* 27 Cal.4th at p. 1269.) The trial court did not err when it declined to modify the sentence.

### 2. *Equal Protection Challenge to Imposition of the Death Penalty*

Defendant argues that the death penalty in California violates the California Constitution and the Eighth and Fourteenth Amendments to the United States Constitution because it is imposed arbitrarily and capriciously depending on the county in which the case is prosecuted. As defendant concedes, we have repeatedly rejected substantially similar claims, concluding that "prosecutorial discretion to select those eligible cases in which the death penalty [would] actually be sought does not . . . offend principles of equal protection, due process, or cruel and/or unusual punishment. [Citations.]" (*People v. Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081]; see *People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Williams, supra,* 16 Cal.4th at p. 278.) Defendant does not identify a reason to reconsider our prior holdings and we decline to do so.[19]

### 3. *Delay in Appointment of Appellate Counsel*

Defendant contends that the four and a half years it took to appoint appellate counsel to represent him violates his rights under the United States Constitution. We have previously considered and rejected identical claims. (*People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Snow* (2003) 30 Cal.4th 43, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Welch* (1999) 20 Cal.4th 701, 775–776 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Holt* (1997) 15 Cal.4th 619, 708–709 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Defendant relies on federal authority in noncapital cases, but as we have explained, "[n]one of those decisions address the unique demands of appellate representation in capital cases." (*People v. Holt, supra,* 15 Cal.4th at p. 709.) Additionally, "defendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital

---

[19] Defendant urges this court to reexamine our prior cases in light of the high court's voting rights decision in *Bush v. Gore* (2000) 531 U.S. 98 [148 L.Ed.2d 388, 121 S.Ct. 525]. That case does not warrant revisiting our prior holdings.

appellants." (*Ibid.*) Defendant has identified no reason to reconsider our prior holdings and we decline to do so.

### 4. *Eighth Amendment Challenge to Preexecution Delay*

Defendant argues that executing defendant after his "lengthy confinement under sentence of death"[20] would constitute cruel and unusual punishment in violation of the federal Constitution, the California Constitution, and international law. We have repeatedly rejected this claim and do so again here. As we have explained, "the delay inherent in the automatic appeal process 'is not a basis for finding that either the death penalty itself or the process leading to it is cruel and unusual punishment.' (*People v. Hill* [(1992)] 3 Cal.4th [959,] 1016 [13 Cal.Rptr.2d 475, 839 P.2d 984] . . . .)" (*People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29], italics omitted; see *People v. Jones, supra,* 29 Cal.4th at p. 1267; *People v. Anderson* (2001) 25 Cal.4th 543, 606 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Frye* (1998) 18 Cal.4th 894, 1030–1031 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

### 5. *Other Constitutional Challenges to Death Penalty Statute and Instructions*

Defendant contends a number of California's death penalty provisions violate the federal Constitution. He acknowledges that this court has repeatedly rejected identical claims in prior decisions but argues that we should reconsider our holdings. Having found no reason to do so, we reject these claims without extensive discussion.

Defendant argues that California's death penalty statute does not meaningfully narrow the pool of murderers eligible for the death penalty. We have repeatedly held that section 190.2 "does not contain so many special circumstances that it fails to perform the constitutionally mandated narrowing function. [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 677 [21 Cal.Rptr.3d 612, 101 P.3d 509]; see *People v. Morrison* (2004) 34 Cal.4th 698, 729 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. Crittenden* (1994) 9 Cal.4th 83, 154–156 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

Defendant contends section 190.3, factor (a) is unconstitutional because it has been applied in such a "wanton and freakish manner," without the application of any reasonable limiting construction, that it results in the arbitrary and capricious imposition of the death penalty. To the contrary,

---

[20] Defendant was sentenced to death on January 9, 1997.

section 190.3, factor (a) "instructs the jury to consider a relevant subject matter and does so in understandable terms." (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Defendant further complains that factor (a) unconstitutionally permits circumstances to be considered aggravating in one case while neutral or mitigating in another case. We have rejected this precise claim, explaining that "there is no constitutional requirement that the sentencer compare the defendant's culpability with the culpability of other defendants. [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1051 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Defendant argues that California's death penalty statute violates the federal Constitution because it fails to incorporate certain "safeguards" against the arbitrary imposition of death. We address each alleged omission in turn.

First, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], defendant claims that jurors must find aggravating factors true beyond a reasonable doubt, unanimously agree on the presence of a particular aggravating factor, and find that the aggravating factors outweighed mitigating factors. We have repeatedly rejected such claims. (*People v. Bell* (2007) 40 Cal.4th 582, 620 [54 Cal.Rptr.3d 453, 151 P.3d 292]; *People v. Rogers* (2006) 39 Cal.4th 826, 893 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Morrison, supra*, 34 Cal.4th at pp. 730–731.)

Second, defendant contends the state and federal Constitutions require that the jury be instructed that it may impose a death sentence only if it determines, beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors and that death is the appropriate penalty. We have rejected this contention on numerous occasions. (*People v. Bell, supra*, 40 Cal.4th at p. 620; *People v. Avila* (2006) 38 Cal.4th 491, 614 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Morrison, supra*, 34 Cal.4th at p. 730.)

Third, defendant argues that the failure to assign the state a burden of proof renders unconstitutional California's death penalty statute. Defendant claims that, at a minimum, a jury should have to find, by a preponderance of the evidence, that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence. We disagree. We have previously concluded that no burden of proof or burden of persuasion is required during the penalty determination. (*People v. Elliot* (2005) 37 Cal.4th 453, 487–488 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *People v. Lenart, supra*, 32 Cal.4th at pp. 1135–1136.) Defendant identifies no reason to revisit our prior decisions.

Fourth, defendant contends that some burden of proof is constitutionally required at the penalty phase to break ties for those jurors who find themselves torn between imposing a death sentence and sentencing the defendant to life without the possibility of parole. As discussed above, no burden of proof or burden of persuasion is required during the penalty phase. (*People v. Elliot, supra,* 37 Cal.4th at pp. 487–488; *People v. Lenart, supra,* 32 Cal.4th at pp. 1135–1136.) Additionally, the jury was instructed it could return a sentence of death only if it "conclude[d] that the aggravating circumstances substantially outweigh the mitigating circumstances." Accordingly, no "tie-breaking rule" was necessary.

Fifth, defendant alternatively argues that the jury should have been instructed that there was no burden of proof. We have repeatedly rejected identical claims. (*People v. Elliot, supra,* 37 Cal.4th at p. 488; *People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

Sixth, defendant contends the failure to require written or other specific findings by the jury regarding aggravating factors violates the federal Constitution. We have rejected that contention on numerous occasions. (See *People v. Elliot, supra,* 37 Cal.4th at p. 488.)

Seventh, defendant claims that the lack of intercase proportionality review for death penalty cases is unconstitutional. We have, as defendant acknowledges, repeatedly held that intercase proportionality review is not required. (*People v. Williams* (2006) 40 Cal.4th 287, 338 [52 Cal.Rptr.3d 268, 148 P.3d 47]; *People v. Elliot, supra,* 37 Cal.4th at p. 488; *People v. Anderson, supra,* 25 Cal.4th at p. 602.)

Defendant argues that the California sentencing scheme denies capital defendants equal protection by denying procedural safeguards to capital defendants that are afforded to noncapital defendants. As we have previously explained, "[t]he death penalty law does not deny capital defendants equal protection because it provides a different method of determining the sentence than is used in noncapital cases." (*People v. Smith, supra,* 35 Cal.4th at p. 374.)

Defendant contends the death penalty statute violates international law, a contention we have repeatedly rejected. (*People v. Elliot, supra,* 37 Cal.4th at p. 488.) Nor, contrary to defendant's argument, does the death penalty violate the Eighth and Fourteenth Amendments to the United States Constitution. (*People v. Blair* (2005) 36 Cal.4th 686, 754–755 [31 Cal.Rptr.3d 485, 115 P.3d 1145].)

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.