Filed 2/25/25  P. v. Jenkins CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHARLES JENKINS,<br><br>　　Defendant and Appellant. | D082930<br><br><br><br>(Super. Ct. No. SCE406824 ) |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed with instructions.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Charles Jenkins appeals his conviction for six sex offenses against his daughter and stepdaughter.  Jenkins claims the prosecutor erred by

cross-examining Jenkins about a third victim and by asking one of the victims if she was pregnant.[1]  Finding no merit to either claim, we affirm.

## II. BACKGROUND

Jenkins is J.O.'s biological father.  In 1986, after her mother died, then 12-year-old J.O. began living with Jenkins.  Soon after J.O. moved in, Jenkins began coming into her room at night.  At first Jenkins would just check on J.O., but then he started rubbing J.O.'s back in a sexual manner and cuddling with her.  Jenkins then progressed to touching J.O.'s breasts, butt, and vagina, as well as masturbating on her bed.  Jenkins also tried to get J.O. to watch pornography with him and made her touch his penis.

One night in 1989, when J.O. was 15, Jenkins came home drunk and tried to have sex with J.O.  Jenkins forced J.O. onto her bed, laid on top of her, and began removing her clothes.  As J.O. struggled to get away, Jenkins inserted his fingers in her vagina.  J.O. then broke free, kicking Jenkins and hitting him with a lamp.  After hitting Jenkins with additional household items, J.O. barricaded herself in her room and escaped through her window to her boyfriend's house.  J.O. lived with her boyfriend's mother, Joan Bier, from that point until she graduated high school.

Around 1990, Jenkins began dating his current wife, Marie Jenkins. Ms. Jenkins and three of her daughters, M.W., Mary Ogborn,[2] and R.D., moved in with Jenkins a few months later.  Around the time M.W. was

---

[1]     Jenkins uses the term "prosecutorial misconduct," but that " 'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.)

[2]     Ms. Ogborn, who is an adult, was called by Jenkins to testify and did not report being molested.  Therefore, we use her full name.

2

10 years old, Jenkins repeatedly molested her. One time, M.W. awoke with her hand on Jenkins's erect penis. On a separate occasion, M.W. woke up to Jenkins's mouth on her vagina. In another incident, while M.W. slept, Jenkins inserted something into her anus, causing her to bleed. And on at least five occasions, M.W. awoke to Jenkins putting something inside her vagina. She presumed it was his fingers.

M.W. tried to tell Ms. Jenkins about the anal penetration incident after it happened, but Ms. Jenkins believed M.W. had just started her period. When Ms. Jenkins confronted Jenkins about M.W.'s accusation, he claimed he accidently wiped M.W. too hard while helping her go to the bathroom. M.W. also disclosed the oral copulation to her mother. The abuse stopped after Jenkins hit R.D. and the girls were placed in foster care.

While in foster care, M.W. was afraid to report Jenkins because she worried she would be permanently separated from her mother. When she turned 18 years old, M.W. told her biological father about the abuse she suffered. M.W.'s father told her the statute of limitations on Jenkins's offenses had expired, which M.W. believed.

In 2020, after watching her son turn 10—M.W.'s age when Jenkins first started molesting her—and learning from other resources that Jenkins could still be prosecuted, M.W. decided to contact law enforcement.[3] J.O. agreed to do the same after M.W. contacted her through social media and they both reported Jenkins's crimes to the police. They also called Jenkins several times to confront him. In a call with J.O., Jenkins admitted mistreating J.O.

---

[3] Pursuant to Penal Code sections 801.1, subdivision (a), and 803, subdivision (f), despite the passage of time, the offenses were not barred by the statute of limitations. All further undesignated statutory references are to the Penal Code.

while she was a child without stating any specifics. During a call with M.W., Jenkins admitted molesting M.W. when she was 10 years old and apologized.

When interviewed by the police in 2020, Jenkins admitted an incident where he came home "drunker than hell" and tried to cuddle with J.O. in her bed. Jenkins also said he did not remember abusing M.W., but acknowledged it was possible based on his history of being abused as a child.

In 2022, the Office of the San Diego District Attorney charged Jenkins with one count of sexual penetration with J.O. (§ 289, subd. (a); count 1), and five counts of lewd acts upon a child with M.W. (§ 288, subd (a); counts 2–6). At his first trial in 2023, the jury was not able to reach a verdict on any count, so the trial court declared a mistrial.

J.O. and M.W. testified at Jenkins's second trial several months later, detailing Jenkins's abuse. After stating she was "nauseous and [ ] overwhelmed" at the beginning of her testimony, the prosecutor asked M.W. if she was pregnant. M.W. confirmed she was, revealing she had recently suffered several miscarriages.

The jury saw footage of Jenkins's interview with the police, and Jenkins's brother testified that Jenkins admitted trying to have sex with J.O., causing her to move out. The jury also heard from Ms. Bier, who stated J.O. moved into her house in 1989 and stayed there until she graduated from high school. Ms. Bier knew J.O. ran away from home based on her relationship with her father. M.W.'s biological father testified as well, confirming that when M.W. disclosed the abuse to him as a young adult, he informed M.W. that prosecution for Jenkins's crimes was time-barred.

The People offered expert testimony from a forensic interviewer and a detective to explain that children commonly delay disclosing sexual abuse. The factors that contribute to delays include the relationship with the abuser,

the absence of support from the non-abusing parent, and fear of being removed from the home. Several of Jenkins's neighbors also testified for the People, describing frequent fighting and drinking at Jenkins's home, including several instances where M.W. sought police intervention because she was afraid of Jenkins.

Jenkins testified in his own defense. He admitted coming home drunk and trying to cuddle with J.O., claiming that because she was on drugs J.O. "flipped out."[4] Jenkins otherwise denied molesting J.O. and M.W. The prosecutor attempted to question Jenkins about his alleged abuse of R.D., but the trial court sustained defense counsel's objections to that line of inquiry. Jenkins also offered testimony from his stepdaughter Ogborn, his other daughter Samantha Coon, and two neighbors, all of whom denied seeing Jenkins doing anything sexually inappropriate.

The jury found Jenkins guilty of all six counts, and the trial court sentenced Jenkins to prison for 18 years to life.[5] Jenkins's appeal followed.

## III. DISCUSSION

### A.  *Standard of Review*

Prosecutorial error, as a matter of state law, occurs when a prosecutor "engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict." ( *People v. Lightsey* (2012) 54 Cal.4th 668, 718.) "In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35.) A

---

[4]     J.O. admitted using methamphetamine to cope with Jenkins's abuse, including on the night of the offense in count 1.

[5]     Jenkins's prison term consists of five concurrent 15-year-to-life sentences for counts 2 through 6, plus a three-year term for count 1.

prosecutor's actions violate federal constitutional protections when there is "a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law." (*Lightsey*, at p. 718.) Relief is unavailable under federal law if "the challenged conduct was . . . harmless beyond a reasonable doubt." (*Blacksher*, at p. 828, fn. 35.)

## B.     *The Prosecutor Did Not Disregard the Trial Court's In Limine Rulings and His Conduct Did Not Impact the Jury*

Jenkins believes that prior to trial, the trial court excluded any reference to Jenkins's alleged molestation of R.D. Jenkins claims the prosecutor flagrantly disregarded that ruling by asking Jenkins on cross-examination whether he knew that R.D. accused Jenkins of touching her vagina. We disagree with Jenkins's characterization of the trial court's ruling and find no prosecutorial error. We further find even if we were to construe the prosecutor's conduct as error, it was harmless because it did not affect the jury's verdict.

### 1. Additional Background

At a pretrial conference on July 21, 2023, the prosecutor stated the only change to the People's witness list from the first trial was the addition of R.D. as a potential witness. The prosecutor intended to elicit testimony from R.D. pursuant to Evidence Code section 1108[6] that Jenkins sexually abused her which would support an inference that Jenkins had a propensity for committing sexual offenses against minors.

After Jenkins briefly asserted R.D.'s testimony did not qualify under Evidence Code section 1108, the discussion shifted to the admissibility of

---

[6]     Evidence Code section 1108 allows admission of prior sex offenses as propensity evidence.

6

evidence regarding Jenkins's alleged physical abuse[7] of his daughter and stepdaughters. Jenkins argued physical abuse was irrelevant, and nothing changed since the first trial where the trial court excluded physical abuse evidence. The prosecutor asked the court to revisit its ruling on the physical abuse, claiming it was relevant to the victims' delayed disclosures as well as rebutting defense witnesses. The trial court ultimately stated that its prior ruling remained, and the People could not introduce physical abuse evidence in their case-in-chief.

Later in the same pretrial conference, the trial court denied Jenkins's motion to exclude evidence of uncharged sex offenses against R.D. and J.O. The trial court found that evidence "absolutely relevant," and "highly probative."

On July 25, 2023, prior to the beginning of trial, the prosecutor stated R.D. might not be available by the time the People rest, so he may call R.D. as a rebuttal witness or seek leave to reopen the People's case. In response, Jenkins moved to limit R.D.'s testimony, arguing that some of it would not describe sexual offenses as that term is defined in Evidence Code section 1108. The trial court disagreed with Jenkins and denied his motion.

Ultimately, R.D. did not testify. When Jenkins testified, he denied sexually inappropriate behavior with children. The prosecutor then asked Jenkins, "[y]ou know that [R.D.] wrote to Detective Knuteson that you touched her vagina?" The trial court sustained defense counsel's objection that the question was based on facts not in evidence and admonished the jury to disregard it. The prosecutor had sought to impeach Jenkins with an email

---

7    The parties used the term "physical abuse" to refer to non-sexual abusive touching. We do the same in this opinion.

from R.D. to Detective Knuteson.  Defense counsel objected, and during a sidebar conference the trial court found the email inadmissible.

At a subsequent sidebar conference, defense counsel moved for a mistrial, claiming Jenkins could not receive a fair trial after the jury heard of a third victim, R.D.  The trial court stated that while evidence of sexual abuse against other victims could be admissible, such abuse was unsupported under the circumstances.  The trial court denied the motion, but stated the prosecutor is "coming close to warranting a mistrial.  Absolutely no reason for evidence as to prior acts, especially unfounded."

2. Analysis

Jenkins cites the trial court's rulings from July 21, 2023, to support his argument that the trial court excluded evidence of Jenkins's alleged sexual abuse of R.D.  However, as shown above, the trial court made no such ruling.  Instead, the trial court ruled that Jenkins's alleged sexual abuse of R.D. was admissible but denied the People's use of physical abuse evidence.  The court ruled similarly on July 25, 2023, denying Jenkins's request to limit R.D.'s sexual abuse testimony because the trial court found R.D.'s testimony admissible under Evidence Code section 1108.

Accordingly, we disagree with the premise of Jenkins's argument.  The ruling that the prosecutor allegedly disregarded was never made, so Jenkins's claim of prosecutorial error fails.

In any event, even if error, the prosecutor's conduct was harmless beyond a reasonable doubt.  First, the prosecutor's attempt to question Jenkins about R.D. was one brief moment in a 10-day trial.

Second, the question about R.D.'s allegations went unanswered, and the trial court admonished the jury to disregard it.  "When a trial court sustains defense objections and admonishes the jury to disregard the

8

comments, we assume the jury followed the admonition and that prejudice was therefore avoided." (*People v. Bennett* (2009) 45 Cal.4th 577, 595.) The trial court also instructed the jury that "[n]othing that the attorneys say is evidence," attorneys' "questions are not evidence," and "[i]f I sustained an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did." We presume the jury understood and followed these instructions. (*People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014.)

Finally, this was not a simple "he-said / she-said" case as Jenkins suggests. There were two victims in this case, and the testimony of each supported the other. Indeed, the jury found that the count against J.O. was corroborated by independent evidence.[8]

In addition to the victims' testimony, the jury heard Jenkins's interview with the police where he acknowledged that he may have molested M.W. and admitted that he was "drunker than hell" and tried to cuddle with J.O. during the incident in count 1. The jury also heard from Jenkins's brother that Jenkins admitted trying to have sex with J.O., causing her to move out. Ms. Bier confirmed that J.O. ran away from Jenkins and never returned to live with him, while J.O.'s biological father confirmed that M.W. refrained from reporting Jenkins because she thought the time to do so had expired. J.O. and M.W.'s testimony was also consistent with the opinions of the People's two experts regarding delayed disclosures.

---

[8]     This finding was made pursuant to section 803, subdivision (f), which extends the statute of limitations for certain sex crimes, including the violation of section 289 in count 1. Section 803, subdivision (f)(2)(C) requires that "[t]here is independent evidence that corroborates the victim's allegation."

Based on the strength of this evidence, the brevity of the challenged questioning, and the trial court's instructions, we find that even if the prosecutor's conduct was error, it was harmless beyond a reasonable doubt.

C.      *The Prosecutor Did Not Err by Questioning M.W. About Her Pregnancy*

Jenkins argues the prosecutor improperly elicited testimony from M.W. that she was pregnant, suffered several miscarriages, and feared her testimony may cause another miscarriage. Jenkins argues this was prosecutorial error because the information was irrelevant and used to evoke sympathy for M.W. We disagree.

1. Additional Background

The complained of questioning occurred at the beginning of M.W.'s testimony as follows:

> [Prosecutor:]  Good morning, [M.W.]
>
> [M.W.:]  Good morning.
>
> [Prosecutor:]  How are you feeling right now? It sounds like you are a little emotional.
>
> [M.W.:]  Very much so. I'm nauseous and very overwhelmed.
>
> [Prosecutor:]  Are you currently pregnant?
>
> [M.W.:]  Yeah.
>
> [Prosecutor:]  Is that a yes?
>
> [M.W.:]  Yes.
>
> [Prosecutor:]  Okay. How far along are you right now?
>
> [M.W.:]  We are in our second month, but we had a lot of losses this last year. That's my biggest thing right now.
>
> [Prosecutor:]  What?

| [M.W.:] | Losing this baby again with the other ones. |
| | So I really—I'm really hot and sweaty, overweight, nothing fits, and I can't— |
| [Prosecutor:] | Well, if you feel sick at all, can you just let us know? Okay? |
| The Court: | Do you need some time to compose? |
| [M.W.]: | Can I use the restroom upstairs? |
| The Court: | Let's take our morning recess.[9] |

2. Analysis

A witness's demeanor and manner of testifying are relevant to credibility. (Evid. Code, § 780, subd. (a).) It was therefore reasonable for the prosecutor to ask M.W. if she was pregnant to explore why she was nauseous and overwhelmed while testifying. Further, Jenkins's characterization of the exchange is inaccurate. M.W. brought up her miscarriages, not the prosecutor as Jenkins claims. M.W. also never said she feared testifying would cause another miscarriage. M.W. merely stated that losing her baby was her "biggest thing right now."

Under these circumstances, the prosecutor's brief inquiry into M.W.'s pregnancy was not deceptive or reprehensible. Nor was it a pattern of serious and egregious conduct. Jenkins has therefore failed to show prosecutorial error.[10]

D.     *The Abstract of Judgment Should be Corrected*

Jenkins claims the abstract of judgment incorrectly refers to section 289 in count 1 as "[r]ape by foreign object." He asks that we correct

---

9     The trial court denied Jenkins's request for a mistrial based on this testimony, finding evidence of M.W.'s pregnancy admissible.

10     Finding no error on this ground, we reject Jenkins's claim of cumulative error.

11

the abstract of judgment to state, "sexual penetration" or "sexual penetration by force." The People do not oppose using "sexual penetration by force."

Subdivision (a)(1)(A) of section 289 defines the crime in count 1 as "an act of sexual penetration when the act is accomplished against the victim's will by means of force . . . ." It is therefore consistent with the language of the statute to refer to the crime as "sexual penetration by force." That phrase was also used in the jury's verdict. Accordingly, we will order the trial court to amend the abstract of judgment as agreed by the parties.

## IV. DISPOSITION

The trial court shall amend the abstract of judgment by deleting the phrase "[r]ape by foreign object" in count 1 and replacing it with "sexual penetration by force." Otherwise, the judgment is affirmed.

RUBIN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.

12